**CLEAN HARBORS ENVIRONMENTAL
SERVICES, INC., Petitioner,**

v.

**Alexis M. HERMAN, Secretary, United States Department Of Labor Respondent, and Thomas Dutkiewicz, Intervenor.**

**No. 97–2083.**

United States Court of Appeals,
First Circuit.

Heard April 10, 1998.

Decided June 10, 1998.

Gary S. Matsko, with whom Judith Ashton and Davis, Malm & D'Agostine, P.C. were on brief, for petitioner.

Barbara Werthmann, Counsel for Appellate Litigation, with whom Marvin Krislov, Deputy Solicitor for National Operations, Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, and Barbara A.W. McConnell, Attorney, U.S. Department of Labor, were on brief, for respondent.

Thomas M. Dutkiewicz, on brief pro se.

Before TORRUELLA, Chief Judge, STAHL and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

Thomas Dutkiewicz was fired by his employer, Clean Harbors Environmental Services, Inc., after he repeatedly complained he felt his supervisors were pressuring him to violate Department of Transportation ("DOT") regulations for hauling hazardous materials, and that he would not do that. The company said he was fired because customers complained about his abrasive manner. Dutkiewicz complained to the company that he had been unfairly and unlawfully terminated. The company rehired Dutkiewicz for a different position, kept him on a short leash, and fired him three months later.

Dutkiewicz filed a complaint with the U.S. Department of Labor under the employee protection provisions of the Safety Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C. § 31105, claiming both his employment terminations were in retaliation for his safety complaints and his refusal to violate federal regulations. The Administrative Law Judge ("ALJ"), in a recommended decision and order, found in favor of Dutkiewicz and awarded back pay, reinstatement, and compensatory damages. The Administrative Review Board ("ARB") affirmed the ALJ's recommendation and also upheld the damages award. Clean Harbors petitions for review to this court, raising one pure issue of law and arguments that the ARB decision is not supported by substantial evidence.

When an employee has "filed a complaint or begun a proceeding," the STAA, 49 U.S.C. § 31105(a)(1)(A), protects that employee from retaliatory adverse employment actions. The question of law, one of first impression in this court, is whether this section protects an employee who has filed purely intracorporate complaints about alleged violations of federal law. We agree with the ARB's interpretation that it does. We also find that substantial evidence supports the ARB's findings that Dutkiewicz in fact "filed" such internal complaints, and that his employment terminations were causally related to that protected activity.

## I.

### A. *Factual Background*

Clean Harbors is an environmental services company based in Braintree, Massachusetts. Its services include treating, storing, hauling, and disposing of hazardous waste. Dutkiewicz began working for Clean Harbors as a truck driver in August of 1993, out of the company's service center in New Britain, Connecticut. Dutkiewicz' primary duty was to haul hazardous waste between the customers' facilities and Clean Harbors' treatment plant in Bristol, Connecticut. This job re-

quired Dutkiewicz to inspect the waste containers for compliance with the law, to inventory, and to load the waste containers onto his truck before hauling them. All of these activities are governed by DOT and Environmental Protection Agency ("EPA") regulations. If customers do not properly prepare their drums of waste for shipment, the driver must spend time at the customers' facilities bringing the drums into compliance with the regulations.[1]

When Dutkiewicz began working for Clean Harbors he received training on compliance with DOT regulations. Dutkiewicz also studied the regulations on his own, and had prior work experience in hauling hazardous materials. No one seriously questioned Dutkiewicz' familiarity with the various regulations that governed his work activities.

Thor Cheyne was the general manager of the New Britain service center during Dutkiewicz' initial tenure with Clean Harbors. Dutkiewicz reported to Cheyne, as well as to Dave Mills, who was Dutkiewicz' job coordinator.[2] Peter Ferrio and Peter Doyle were customer account managers who dealt with the customers to whom Dutkiewicz was assigned. No single individual at the New Britain facility was specifically assigned the task of ensuring compliance with the environmental and safety regulations;[3] instead, each driver was individually responsible for ensuring regulatory compliance on his own jobs.

Soon after Dutkiewicz started working for Clean Harbors, the company began charging customers for "demurrage," or extra time the drivers spent at the customers' facilities filling out paperwork and bringing the shipments into compliance for hauling. Previous-

ly the customers were charged by the job, rather than by the amount of time the driver took to complete the job. After this new charge was imposed, several large-account customers began complaining about Dutkiewicz. According to the company, the customers complained that he was taking too much time at their facilities, second-guessing their shipment preparation, and costing them too much money. In turn, several of the New Britain personnel—Cheyne, Ferrio, and Doyle in particular—pressured Dutkiewicz to stop "wasting time" on site.

Dutkiewicz responded to this pressure saying the customers who complained were the ones who had the most problems with their shipments, and he took the extra time to bring their drums of hazardous waste into compliance before loading them on to his truck. Dutkiewicz stressed that it was his obligation to ensure regulatory compliance, that he personally could be put at risk, and he would not violate the law and endanger himself and others.

As the pressure to perform fast pick-ups continued, Dutkiewicz became increasingly frustrated with what he believed were demands to violate the law, and he decided to document the situation. In early January 1994, Dutkiewicz designed his own drum inspection form. The form listed all of the regulatory requirements and provided space for the driver to document whether the customer had complied with the requirements or whether the driver had to spend time fixing the shipments. Dutkiewicz gave copies to the customer service department and to Cheyne, and subsequently used the forms to document each of his pick-ups. Dutkiewicz hoped the forms would clarify why he was

1. Clean Harbors' policy requires drivers to follow the regulations. Failure to comply with the regulations could result in civil fines for Dutkiewicz personally and for the company, *see* 49 C.F.R. § 107, a serious health hazard for Dutkiewicz and for the workers at the treatment facility who handle the drums, and a danger to the environment. Drivers may be stopped by federal inspectors for compliance spot-checks. The driver is the one responsible for keeping track of the contents of the truck, making sure that the contents comply with the regulations, and ensuring that all the paperwork is in order and accurately describes the contents. *See* 49

C.F.R. §§ 171.2, 177.801. Dutkiewicz testified that he personally had been stopped on numerous occasions. If a customer has inadequately or inaccurately filled out the manifests, it is the driver who must explain the inadequacies to the inspector. *See* 49 C.F.R. §§ 177.801, 802.

2. The job coordinator is the first person to whom the drivers report. He sets up and coordinates the drivers' jobs.

3. The compliance department was located at corporate headquarters in Braintree, Massachusetts.

spending time at the customers' facilities and prove that he was not "wasting time."

In early February 1994, Dutkiewicz received a six-month performance appraisal from Cheyne. Dutkiewicz' overall performance was said to "meet expectations" and he was given a raise. In one of the "comments" sections, Cheyne wrote that "Tom's thoroughness has raised several questions with customers as to his productivity. Tom should continue his quality in that it is quality that customers are buying from [Clean Harbors]."

In early March, in response to continued pressure from Cheyne and Ferrio to spend less time preparing drums, Dutkiewicz wrote a letter to Clean Harbors president Alan McKim. The letter stated, *inter alia:*

> I would like to address when a bad drum is accepted. Clean Harbors and everybody else connected with the drum owns all the problems that go with it. Thor [Cheyne] didn't know if it was a Tom [Dutkiewicz] problem or a customer problem.... So I designed a form for myself to show all concerned what the drums were like when I arrived on site, were the problems solved, and were any [drums] refused [by the driver].
>
> Now when a customer ask [sic] why they were charged for extra time, Thor has documentation on what I did to correct the problem that a customer should have done to make them DOT shippable. I've included a copy of this form for your review.

Sometime in mid-March, Cheyne and Ferrio scolded Dutkiewicz for taking too much time at the facility of one company, a major Clean Harbors account. Dutkiewicz gave his usual response, and invited Cheyne to accompany him on his next run to the company to see for himself that the drums were not in compliance. Cheyne turned down the offer. On April 18, 1994, Cheyne wrote Dutkiewicz this note:

> Tom, I would like you to get in and out of [the customer's premises] w/o demurrage or extra time regardless of condition of drums. Thor
>
> T.T. [Talk To] me if you have any questions.

The note was attached to a memorandum from John Shomsky—a customer service representative—which stated that the customer had complained about Dutkiewicz wasting time on site. Dutkiewicz understood the note to be a direction from his supervisor to accept and haul drums even if the drums did not comply with DOT regulations.

The Cheyne note became the smoking gun in this dispute. Clean Harbors argues that this note was in fact a direction to leave behind any non-compliant drums, not a direction to haul them. But the ALJ and the ARB rejected that interpretation of the note for several reasons. Cheyne himself did not testify, and a Clean Harbors employee testified that the note could plausibly be read as Dutkiewicz read it. The evidence adequately supports the agency's interpretation of the note.

Dutkiewicz responded to the note by writing a letter to Cheyne and Shomsky, dated April 19, 1994, stating:

> First I would like to address the last pickup from [the customer]. From the time I arrived until Irene came down 20 minutes passed. She had visible waste on three drums, three drums didn't have any poison or corrosive label on them, and two drums had lid rings up side [sic] down. She has problems making her drums shippable.
>
> The DOT is not very forgiving if I get stopped because of [sic] one of my drums is leaking. No driver in this company will accept a drum that is not DOT shippable just to make the customer happy. Not only will I get in trouble, its [sic] against the law.
>
> . . . .
>
> The problems relating to customers complaining didn't start until the customer was charged for time spent on site to correct drums. And the ones that complained were the ones that have trouble making their drums shippable.
>
> Believe me when I say it, I have a lot of ground to cover in a course of a day. I don't have time to waste on purpose at a customers [sic] just to make more hours. There is no such saying, there is a faster

way of making a drums [sic] shippable. And as long as people like Irene ... have improper drums, I will have to spend time making them right. Irene is not in transportation, what she thinks is shippable may very well be not shippable according to the DOT. That's my job, is to determine what is or what isn't shippable.

. . . .

In conclusion, ... I refused [sic] to be blamed for this or other shippers [who are unable] to properly label, mark, and secure drums. Yes, the customer is always right, up to a point. No one should be abused by customers or be put at risk because of a customer. There are a lot of clients out there who really don't care.

... If you think I'm wrong in my whole assessment, please feel free to call Tony Cellucci or Kent Bongarzone [compliance department supervisors] and we can discuss this matter in further detail.

The record reveals no effort on the part of Cheyne or Ferrio to contact the compliance department, or to determine whether or not Dutkiewicz was correct that the customers were not properly preparing their hazardous materials for shipment.

Dutkiewicz also showed the Cheyne note to Dave Cyr, the Clean Harbors operations manager at the Bristol, Connecticut facility,[4] and to Brian Peterson, the general manager of the Bristol facility. Dutkiewicz testified that he "told Dave Cyr [he] was concerned about protecting [him]self in the future," and that he "also wanted to alert them that Thor Cheyne was instructing Clean Harbors' personnel to engage in practices contrary to EPA and DOT regulations."

On September 1, 1994, Cheyne gave Dutkiewicz his second performance review. He rated Dutkiewicz' overall performance as "meets expectations," and gave Dutkiewicz a raise.

Two weeks later, Ferrio sent a memorandum to Cheyne stating that Ferrio had received more complaints about Dutkiewicz. Ferrio suggested that Cheyne either replace

Dutkiewicz or find another job for him in which there was no customer contact. Later that same day Ferrio wrote another note to Cheyne indicating that if Cheyne failed to take proper action Ferrio would "go over [Cheyne's] head." Three days later, September 19, 1994, Cheyne did as Ferrio asked and fired Dutkiewicz. He told Dutkiewicz that customers were upset because he was wasting too much time fixing drums.

Dutkiewicz immediately phoned and wrote Steven Pozner, the company vice president for compliance, health and safety. Dutkiewicz complained that his discharge resulted from Cheyne's lack of understanding of the DOT regulations, Cheyne's immediate impulse to side with the customers and customer service managers, and Dutkiewicz' refusal to cut corners. Dutkiewicz requested that the corporate office investigate his discharge and reinstate him.

The company initially upheld the termination. When Dutkiewicz' wife phoned Tony Celluci, director of transportation compliance, and threatened to report the termination to the federal government and the media, the company offered Dutkiewicz three weeks of paid leave and agreed to investigate the termination further. Clean Harbors hired a consultant, who ultimately suggested that Dutkiewicz could be reinstated, albeit with strict supervision and under a rigid chain of command.

In late October, 1994, Clean Harbors reinstated Dutkiewicz as a driver based at the Bristol facility. His new job was to haul waste between the company's own facilities, rather than from customers' facilities. The new job offer was conditioned on Dutkiewicz' acceptance of a strict chain of command: Dutkiewicz was to direct any questions or comments only to John Caron, the Bristol Transportation Coordinator, or to Brian Monahan, the Bristol Director of Logistics. When Dutkiewicz started work, he met with Caron and Monahan who informed Dutkiewicz that he was "on a short leash."

---

**4.** Much of the material that was hauled by drivers at the New Britain facility was taken to the Bristol facility for treatment and disposal. The

employees at Bristol had an interest in the state of the drums coming into that facility.

Dutkiewicz testified that over the next few months he noticed a number of DOT regulations violations, and reported them to his supervisors and corporate compliance personnel. Monahan terminated Dutkiewicz on January 16, 1995, stating simply that things were not working out and Dutkiewicz and Clean Harbors were a bad match.

## B. *Procedural Background*

After he was fired the second time, Dutkiewicz filed a timely complaint with the Department of Labor ("DOL"), claiming Clean Harbors terminated him (twice) in violation of the employee protection provision of the STAA. That provision reads:

(a) Prohibitions. (1) A person may not discharge an employee regarding pay, terms, or privileges of employment, because—

(A) the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety regulation, standard, or order, or has testified *or will testify in such a proceeding; or*

(B) the employee refuses to operate a vehicle because—

(i) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety or health; or

(ii) the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's unsafe condition.

49 U.S.C. § 31105(a). After investigation, the OSHA Regional Administrator (acting pursuant to DOL regulations) found that Dutkiewicz' claim was unsupported, and dismissed the complaint. Dutkiewicz objected to the findings and had a hearing before an ALJ.

The ALJ, who credited Dutkiewicz' testimony, found that Dutkiewicz had engaged in protected activity under both §§ 31105(a)(1)(A) and (B), and that both of his employment terminations were related to these protected activities. As for § (a)(1)(A), the ALJ found that, before the first of his employment terminations, Dutkiewicz continuously complained to Cheyne that he was pressured by the customer service personnel and by Cheyne to violate DOT regulations. The ALJ also found that, "with respect to refusal to operate a vehicle [§ (a)(1)(B)], complainant has presented evidence by his own testimony, supported by his contemporaneously prepared drum inspection forms, that he continuously refused to drive Clean Harbors vehicles containing hazardous materials that he believed violated DOT regulations." The ALJ agreed that customer complaints could be a valid reason for discharging an employee, but found that Clean Harbors fired Dutkiewicz because he refused to compromise his fastidious compliance with the regulations, thereby angering customers and jeopardizing accounts. The ALJ also found that the second firing was inextricably linked to the first unlawful dismissal. The ALJ concluded that Clean Harbors had violated the STAA, and ordered damages and reinstatement for Dutkiewicz.

■ The ARB found that the ALJ's "findings of fact . . . are supported by substantial evidence on the record as a whole and therefore are conclusive." *See* 29 C.F.R. § 1978.109(c)(3). It also adopted the ALJ's assessments of witness credibility. The ARB then affirmed the ALJ's decision to order damages and reinstatement, but it did so based solely on the fact that Dutkiewicz' termination was related to his protected activity of "fil[ing] a complaint." [5]

---

**5.** The ARB did not reach the issue of whether Dutkiewicz had also engaged in the protected activity of refusing to drive a vehicle. We review the final agency decision as announced in the decision of the ARB. *See Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (reviewing courts must judge the agency's decision on the grounds upon which the agency stated its decision was based). Courts have fashioned an exception to the *Chenery* doctrine, and on occasion have af-

firmed an agency decision on a ground not specifically articulated by the agency where "it is clear that based on the valid findings the agency would have reached the same ultimate result" on different grounds. *Consolidation Coal Co. v. Smith*, 837 F.2d 321, 323 n. 3 (8th Cir.1988) (citing *Salt River Project Agric. Improvement and Power Dist. v. United States*, 762 F.2d 1053, 1060–61 n. 8 (D.C.Cir.1985)). We need not consider this exception because we affirm the agency based on its articulated ground.

## II.

We review the ARB's final decision in accordance with the dictates of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* The ARB's decision must be affirmed unless its legal conclusions are arbitrary, capricious, or otherwise not in accordance with law, or its factual conclusions are unsupported by substantial evidence. *See* 5 U.S.C. § 706(2); *Castle Coal & Oil Co. v. Reich,* 55 F.3d 41, 44 (2d Cir.1995).

### A. *Statutory Interpretation*

 Dutkiewicz filed no complaints with a court or government agency before his first employment termination. Thus, the ARB's determination that Dutkiewicz engaged in protected activity depends entirely upon a reading of § 31105(a)(1)(A) to cover complaints which are purely internal to the employer.[6] This interpretation of "filed a complaint or begun a proceeding" raises an issue of law.

Citing its own precedent, the ARB found that "[a]n employee's internal complaint to superiors conveying his reasonable belief that the company was engaging in a violation of a motor vehicle safety regulation is a protected activity under [§ 31105(a)(1)(A) ]." *Dutkiewicz v. Clean Harbors Envtl. Servs.,* Case No. 97–STA–090, Sec. Dec. and Ord., Aug. 8, 1997, slip op. at 3–4 ("ARB Dec.") (citing *Stiles v. J.B. Hunt Transp., Inc.,* Case No. 92–STA–34, Sec. Dec. and Ord., Sept 24, 1993, slip op. at 3–4).

Clean Harbors argues that the ARB's interpretation of the STAA is in contravention of that statute's plain meaning, and that "this ['filed a complaint or begun a proceeding'] language clearly connotes the initiation of a formal administrative or court proceeding and not merely internal complaints." Clean Harbors contrasts this STAA language with the anti-retaliation provisions of other statutes, most notably, Title VII, which provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3. According to Clean Harbors, because Congress could have used this language in the STAA—language which clearly protects an employee who makes internal complaints—it must have intended the narrower language it ultimately did use not to protect an employee who makes purely internal complaints.

We reject the company's interpretation that the STAA anti-retaliation protection is available only to employees who file complaints with a government agency or a court. We do so for four reasons. First, the language is susceptible to more than one reading.[7] Second, the Congress hewed to this language when it reenacted the STAA in 1994, in the face of long-standing administrative interpretation of the STAA and similar language in other statutes to encompass internal complaints made to an employer. Third, in the absence of unambiguous statutory language, this strikes us as the sort of interstitial law making which Congress left to the agency, under *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Fourth, the policy choice made by the agency is eminently reasonable. It is reasonable in terms of leveraging the government's limited enforcement resources.

The STAA was originally enacted in 1983. The employee protection provision, like other whistleblower statutes, was intended to create a climate in which employees would feel free to voice their health and safety concerns without fear of employer retaliation. *See Brock v. Roadway Express, Inc.,* 481 U.S.

---

**6.** This case does not involve the very different issue of complaints which prove to be a matter of only internal concern to the employer. *Cf. Hinchey v. NYNEX Corp.,* 144 F.3d 134, 144–45 (1st Cir.1998).

**7.** For example, the language does not say where a complaint must be filed. The fact that Congress could have used broader language, which more clearly encompasses internal complaints, does not mean that the language it did use necessarily does not encompass such complaints.

252, 257, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) ("Section [31105] was enacted in 1983 to encourage employee reporting of noncompliance with safety regulations governing commercial motor vehicles.").

The STAA was recodified and reenacted in 1994, expressly without substantive change. *See* Revision of Title 49, Transportation, United States Code, Pub.L. 103–272, § 1, 108 Stat. 745, 990–91 (1994). In the years between 1983 and 1994, the Secretary of Labor and two courts of appeals interpreted the employee protection language to encompass purely internal complaints. *See Yellow Freight Sys., Inc. v. Reich*, 8 F.3d 980, 986 (4th Cir.1993) (oral complaints to supervisor "are protected activity under the STAA"); *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 227–29 (6th Cir.1987) (finding that driver had engaged in protected activity under the STAA where driver had made only oral complaints to supervisors); *Stiles*, Case No. 92–STA–34, slip op. at 3–4 (citing cases); *see also Yellow Freight Sys., Inc. v. Martin*, 983 F.2d 1195, 1198 (2d Cir.1993) (implying but not specifically stating that employee's internal safety complaints were covered by § 31105(a)).

In addition, a large body of judicial case law developed, consistently interpreting language either identical or very similar to the language in § 31105(a)(1)(A) to encompass internal employee complaints. *See, e.g., Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor*, 992 F.2d 474, 478 (3d Cir.1993) (interpreting § 507 of the Clean Water Act, which prohibits retaliation against an employee because the employee has "filed [or] instituted . . . any proceeding under this chapter," to include the filing of intracorporate complaints); *EEOC v. Romeo Community Sch. Dist*, 976 F.2d 985, 989–90 (6th Cir.1992) (interpreting Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), which prohibits retaliation against an employee "because such employee has filed any complaint or instituted . . . any proceeding under or related to [the FLSA]," to protect employees who make unofficial complaints to their supervisors); *Rayner v. Smirl*, 873 F.2d 60, 63–64 (4th Cir.1989) (interpreting Federal Railway Safety Act ("FRSA"), 45

U.S.C. § 441, which prohibits retaliation because an employee has "filed any complaint or instituted or caused to be instituted any proceeding" under the FRSA or related safety laws, to protect employees who make purely internal complaints); *EEOC v. White and Son Enters.*, 881 F.2d 1006, 1011 (11th Cir.1989) (interpreting FLSA language, 29 U.S.C. § 215(a)(3), to include "unofficial complaints expressed by the women to their employer"); *Love v. Re/Max of America, Inc.*, 738 F.2d 383, 387 (10th Cir.1984) (same). *But see Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2d Cir.1993) (interpreting FLSA not to encompass complaints made to a supervisor).

Congress was surely aware of these administrative and judicial interpretations when it reenacted the STAA without substantive change. *See Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change."). If Congress wanted to restrict the protected activity in § 31105(a)(1)(A) to filing complaints with the courts or agencies, it would have done so when it recodified the law.

We also find persuasive the Secretary of Labor's argument that interpreting "filed a complaint" to encompass only filings with a court or government agency would create a redundancy in the statute. The STAA protects employees who have "filed a complaint" or "begun a proceeding." 49 U.S.C. § 31105(a)(1)(A). A court or agency filing itself "beg[ins] a proceeding," and the "file a complaint" language would thus be superfluous on Clean Harbors' reading of the statute. *See Bailey v. United States*, 516 U.S. 137, 146, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.").

Moreover, the ARB's interpretation is reasonable. First, it is supported by the obvious policy of encouraging corporate compliance with such laws by casting a broad net in the anti-retaliation provisions. As the Supreme Court has noted in interpreting an analogous whistleblower statute, "it needs no

argument to show that fear of economic retaliation might often operate to induce aggrieved employees to accept substandard conditions." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) (interpreting employee protection provision in FLSA). A construction of the STAA that covers only complaints filed with courts or government agencies would narrow the mechanisms to achieve these policy goals, leaving unprotected employees who in good faith assert safety concerns to their employers, or who indicate an unwillingness to engage in such violations. *See Passaic Valley*, 992 F.2d at 478 ("Section 507(a)'s protection would be largely hollow if it were restricted to the point of filing a formal complaint with the appropriate external law enforcement agency.").

Interpreting § 31105(a)(1)(A) to protect only employees who file external complaints would result in an anomalous and inefficient system. The effect of the system urged by Clean Harbors would be to force employees with safety concerns to go straight to the government. A company's opportunity to remedy its own problems voluntarily and quietly would be lost. *Cf. id.* at 478–79. Thus, the DOL's interpretation in many ways helps companies. There is the contrary argument that companies will benefit economically by reducing the number of employee complaints by making employees go to greater efforts to file a complaint with the government. That some employees (unhappy with company practices) may choose silence over going directly to the government may indeed permit a company to skate by the requirements of the law for a period, and (perhaps) temporarily benefit economically. But the penalties for noncompliance are high, and unhappy employees are likely to help the government make its case once the government does become involved. It is reasonable to conclude that the ARB's position is fairer and less wasteful of resources for both the corporate community and the government than the position offered by Clean Harbors.

Clean Harbors does make one very telling argument: that its interpretation of the statute provides clean and simple guidance on what a "complaint" is and the agency's interpretation unhelpfully leaves employers in the dark. What sort of internal complaint is "filing a complaint" for purposes of the Act? We think the problem, while real, is not sufficient to invalidate the agency's interpretation, and may be dealt with as a matter of factual analysis.

The ARB's construction of the STAA is plainly a reasonable and permissible one.

## B. *Substantial Evidence*

■ Clean Harbors protests that there is not substantial evidence that what Dutkiewicz did amounted to filing a complaint or that this activity is why Clean Harbors terminated his employment. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation and quotation marks omitted).

■ A prima facie case of unlawful termination under the STAA requires a showing that the employee engaged in protected activity, that the employee was subjected to adverse employment action, and that there was a causal connection between the protected activity and the adverse action. *See Moon*, 836 F.2d at 229. Clean Harbors took adverse employment action against Dutkiewicz, but contests that Dutkiewicz engaged in any protected activity, and that there was a causal link between any protected activity and the adverse employment action.

■ The familiar burden-shifting analysis employed under Title VII has also been employed under the STAA. Where a complainant has made out a prima facie case of retaliatory discharge, the employer may rebut that showing with evidence of a legitimate, non-retaliatory reason for the discharge. The burden then shifts back to the complainant to prove that the proffered reason is pretext for unlawful retaliation. *See id.* (adapting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to a STAA claim). Where evidence of a dual motive exists, i.e., where there are legitimate reasons for a discharge in addition to the unlawful reasons, the employer bears the burden

of establishing by a preponderance of the evidence that it would have taken the adverse employment action in the absence of the employee's protected activity. *Cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 242, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Both parties have accepted this as the standard and we do not reexamine it.

### 1. *"Filing" a Complaint*

█ The facts of record support the ARB's determination that the activity in which Dutkiewicz engaged met the requirements for "filing a complaint." There is no problem of lack of fair notice on this record and we affirm that there was substantial evidence that Dutkiewicz "filed a complaint."

We recognize Clean Harbors' legitimate due process concerns that the internal communications to the employer must be sufficient to give notice that a complaint is being filed and thus that the activity is protected. In the absence of such notice, the beneficial purposes of the act cannot be accomplished. Clearly there is a point at which an employee's concerns and comments are too generalized and informal to constitute "complaints" that are "filed" with an employer within the meaning of the STAA. The risk of inadequate notice to an employer that the employee has engaged in protected activity is greater when the alleged protected complaints are purely oral. Here, however, we have no trouble concluding that Dutkiewicz' oral and written complaints were sufficiently definite to put Clean Harbors on notice that he was engaging in protected activity. The record makes it clear that Dutkiewicz' superiors were well-aware of his fastidious compliance with safety regulations and his oral and written refusals to accommodate this practice for the sake of customer satisfaction.

The agency accepted Dutkiewicz' testimony that when Cheyne and Ferrio repeatedly urged him to perform quicker pick-ups, he complained to them that such action would result in regulatory violations, and that he was obligated by law to make sure the customers' drums were DOT-shippable before he hauled them. He continued to say this to Cheyne throughout the remainder of his initial tenure at Clean Harbors. Because Cheyne did not testify, Dutkiewicz' testimony that he repeatedly complained to Cheyne was unrefuted. The ALJ credited Dutkiewicz' testimony, and found that Dutkiewicz did have a genuine, reasonable belief on many occasions that drums tendered to him for shipment did not comply with DOT regulations. The ARB accepted the ALJ's credibility determinations, and agreed with this finding. Dutkiewicz' testimony is further supported by the drum inspection forms which he contemporaneously created and filled out to protect himself from accusations of wasting time.

Aside from the oral complaints and the drum inspection forms, Dutkiewicz wrote two letters to his superiors complaining that he felt pressured to engage in regulatory violations. The first such letter was written on March 5, 1994, to the president of Clean Harbors, Alan McKim. In the letter Dutkiewicz asserts that when a "bad drum" is accepted, "Clean Harbors and everybody else connected with the drum owns all the problems that go with it. Thor didn't know if it was a [Dutkiewicz] problem or a customer problem. . . . So I designed a form for myself to show all concerned what the drums were like when I arrived on site, were the problems solved, and were any [drums] refused."

The second letter was written the day after Dutkiewicz received Cheyne's demand that Dutkiewicz "get in and out of [the customer's premises] . . . regardless of the condition of the drums." Dutkiewicz responded with a letter to Cheyne and Ferrio, in which he specifically complained that on his last trip the drums were not prepared for shipment: there was "visible waste on three drums, three drums didn't have any poison control labels on them, and two drums had lid rings upside down." The letter reminded Cheyne and Ferrio that:

> The DOT is not very forgiving if I get stopped because of one of my drums is leaking. . . . Not only will I get in trouble, its [sic] against the law. . . . I have a lot of ground to cover in a course of a day. I don't have time to waste on purpose at a customers. . . . And as long as customers

have improper drums, I will have to spend time making them right.

The facts here show Clean Harbors was put on notice and Dutkiewicz "filed" a complaint.

## 2. Causation

■ Clean Harbors' second major factual argument is that even if Dutkiewicz did engage in protected activity and "filed" a complaint, he was fired for the legitimate reason that he was angering customers. The record reveals substantial evidence for the ARB's finding that Dutkiewicz was terminated at least in part because of his protected activity, and that Clean Harbors failed to prove that it would have terminated Dutkiewicz had he not engaged in protected activity.

It was reasonable to conclude the following from the evidence. Cheyne and Ferrio pressured Dutkiewicz to speed up his customer pick-ups. Dutkiewicz refused orally and in writing to submit to this pressure—pressure that he reasonably believed amounted to a demand to violate the law. As customers continued to complain about Dutkiewicz' on-site delay, the customer service staff became increasingly frustrated with Dutkiewicz' refusal to expedite his pick-ups. Ferrio pressured Cheyne to replace or transfer Dutkiewicz. Despite the fact that Cheyne had twice given Dutkiewicz a favorable performance appraisal, Cheyne complied with Ferrio's request and fired Dutkiewicz. Thus, Clean Harbors initially fired Dutkiewicz at least in part because he objected on safety grounds to the demands that he perform faster pick-ups.

Clean Harbors failed to prove that it would have fired Dutkiewicz had he not complained about regulatory violations and refused to expedite his on-site drum preparations. At the hearing, Clean Harbors failed to call Cheyne as a witness and failed to call any of the complaining customers as witnesses. Instead, Clean Harbors chose to rely on the testimony of the customer service manager about the customer complaints. The ARB found that, in the absence of any customer testimony, there was no basis to conclude that customer complaints unrelated to Dutkiewicz' enforcement of the STAA would have been sufficient to otherwise justify the termination of Dutkiewicz' employment. A company may reasonably choose not to impose on its customers to appear as witnesses at trial about complaints they have made, but it does so at its own risk where the customer complaints may give the appearance of being based on the employee's refusal to violate the law.

It may be, as Clean Harbors so vociferously argues now, that Dutkiewicz was rude to customers and that rudeness, and not Dutkiewicz' obduracy about non-conforming drums, was what motivated the complaints. But the agency was not required to believe the accounts of the customer complaints from the customer service manager. This is particularly so where neither Cheyne nor Ferrio ever accompanied Dutkiewicz on a customer pick-up in order to confirm or dispel Dutkiewicz' allegations that the customers were not properly preparing their shipments. They were apparently less concerned with the accuracy of Dutkiewicz' allegations than with the satisfaction of their customers.

Thus, there is sufficient support for the conclusion that the initial termination of Dutkiewicz' employment was in violation of the law.

■ Throughout, the company's brief argues that it was not logical for the company to do what Dutkiewicz claims it did. This is too simple a view and, in any event, a misapprehension of the standard of review. People do things which may strike others as illogical; notions of what is in an actor's self interest may look different to an outside observer than to the actor. A company may have many actors and their individual perceived interests, e.g. satisfaction of a complaining customer, may differ from what is ultimately in the company's interest, e.g. avoidance of a lawsuit for retaliatory discharge. This has been referred to as the theory of "agency costs," where seemingly irrational behavior on the part of a corporation may be explained by the divergence of objectives between a corporation and its employees. *See Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 756 (1st Cir.1996); *AMPAT/Midwest, Inc. v. Illinois Tool*

*Works, Inc.,* 896 F.2d 1035, 1043 (7th Cir. 1990). Further, as Justice Holmes famously said, the life of the law has not been logic, but experience. The standard of review is not whether the findings by the agency comport with a company acting logically, but whether there is substantial evidence to support the agency's findings.

But Dutkiewicz was reinstated, so we shift our focus to the second termination. This is a closer issue. Clean Harbors' articulated reasons for terminating Dutkiewicz the second time were that he had twice bucked the chain of command, and once had made a complaint about Clean Harbors to the Massachusetts Department of Environmental Protection. Specifically, Brian Monahan testified that: (1) Dutkiewicz made an unauthorized call to Brian House, the Vice President of Field Services, and left a lengthy voice mail criticizing a new waste-tracking procedure for use by the company drivers, thereby violating the agreed-upon chain of command; (2) Dutkiewicz called Joseph Lentini, computer installation manager, to request a cellular phone for his truck, again violating the chain of command; and (3) Dutkiewicz contacted the Massachusetts Department of Environmental Protection ("DEP") in bad faith to complain that Clean Harbors was not using proper vehicle identification decals for trucks going to Massachusetts.

The ARB found that the third reason was itself violative of the STAA:

> Here, even though Dutkiewicz received an acceptable response from Clean Harbors employees—that he should drive a different truck rather than the one that lacked a vehicle identification card—he still had the right to speak with DEP concerning a safety issue within that agency's purview. We find therefore that one of the articulated reasons for the second discharge directly violated the STAA.

ARB Dec. at 7. As for Dutkiewicz' failure to adhere to the agreed-upon chain of command, the ARB "agree[d] with the ALJ that the reasons for the first discharge tainted the potentially 'legitimate' reasons articulated for the second discharge." *Id.* The ARB then concluded that "Clean Harbors did not show

that it would have discharged Dutkiewicz the second time if he had never engaged in any protected activities during his employment with the company." *Id.*

Substantial evidence supports the ARB's findings. Under the STAA, Clean Harbors may not fire Dutkiewicz for raising a reasonable safety-related concern with a government agency, here the Massachusetts DEP. The evidence supports the ARB's implicit determination that Dutkiewicz' concern regarding proper vehicle identification was reasonable. And it is also clear from the record that upon his reinstatement, Dutkiewicz, unlike other employees, was required to adhere to a rigid chain of command precisely because of Clean Harbors' previous frustration with Dutkiewicz. That frustration related to Dutkiewicz' protected complaints and strict adherence to safety regulations. Clean Harbors argues that Monahan, Dutkiewicz' supervisor who fired Dutkiewicz the second time, was a new Clean Harbors employee and had no knowledge of the prior relationship between Clean Harbors and Dutkiewicz. Clean Harbors asserts that Monahan had "no axe to grind" as far as Dutkiewicz was concerned, and wanted Dutkiewicz to succeed at Clean Harbors. But Monahan himself testified he was aware of some prior history and had read the consultant's report. That report stated that Dutkiewicz felt his prior termination resulted from his raising safety concerns.

We also find it significant, as did the agency, that Dutkiewicz received no oral or written warnings about any of the three incidents which Clean Harbors says justified his discharge. That is so although Clean Harbors had agreed to document disciplinary violations. The excuse that Clean Harbors gave for its failure to warn Dutkiewicz is that *there was no time to give warnings.* That excuse is weak, given that the "violations" of the chain of command hardly triggered emergencies. We uphold the ARB's finding that the second termination violated the STAA as based on substantial evidence.

The facts in this case do not *compel* a finding that Dutkiewicz' firing was caused by rudeness and poor manners with customers, as Clean Harbors asserts is true. Nor do

the facts *compel* a finding that Clean Harbors fired an employee for complaining about safety issues. This is a close case and Clean Harbors failed to convince the agency that its motives were unrelated to Dutkiewicz' complaints about safety issues. There is enough evidence to support the agency's determination and so it is affirmed.

The decision of the ARB is *affirmed.* Costs awarded to both the Secretary of Labor and Dutkiewicz.