ACME TILE AND TERRAZZO CO.
and Roman Tile & Terrazzo
Co., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 95–1992.

United States Court of Appeals,
First Circuit.

Heard May 8, 1996.

Decided June 25, 1996.

Girard R. Visconti, with whom Visconti &
Boren Ltd. was on brief, for petitioners.

Corinna L. Metcalf, Attorney, National Labor Relations Board, with whom Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, and Joseph J. Jablonski, Jr., Attorney, National Labor Relations Board, were on brief, for respondent.

Before TORRUELLA, Chief Judge, CUMMINGS * and CYR, Circuit Judges.

CUMMINGS, Circuit Judge.

The present controversy has been before this Court once before. It arises out of the actions of various employers alleged to have violated the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("Act"). The Board originally found that the employers violated the Act by conditioning continued employment on union membership and terminating employees who failed to join the union. We remanded to the Board to make additional findings. *NLRB v. Acme Tile & Terrazzo Co.*, 984 F.2d 555 (1st Cir.1993). After doing so, it reached the same conclusion. Satisfied that the Board made the necessary additional findings and that those findings are supported by substantial evidence, we now hold that the Board's order should be enforced.

I.

Acme Tile and Terrazzo Co. and Roman Tile and Terrazzo ("Companies") are members of the Ceramic Tile, Marble and Terrazzo Contractors Association of Rhode Island Corp. ("Association"), a multi-employer association representing contractors headquartered in Rhode Island. The Association is the authorized collective bargaining representative of the Companies. The Companies employ both "finishers" and "setters." Until December 1988, the finishers were represented by Local 36 of the Tile, Marble, Terrazzo Finishers, Shopworkers & Granite Cutters International Union ("Local 36"). Local 36 was party to various pre-hire agreements with the Association, the most recent of which was effective April 1, 1988, through March 31, 1989. The setters were represented by Local 1 of the International Union of Bricklayers and Allied Craftsmen of Rhode Island ("Bricklayers Union"). The Association and the Companies were also parties to collective bargaining agreements with the Bricklayers Union, the most recent of which was effective May 1, 1988, through April 30, 1990.

In 1988, Local 36's International Union affiliated with the International Brotherhood of Carpenters ("Carpenters Union") and Local 36 was newly designated "Local 36–T" of the Carpenters Union. A struggle between the Bricklayers Union and the Carpenters Union ensued. In early 1989, David Barricelli, the Bricklayers Union Business Manager, approached Local 36–T about merging into Local 1 of the Bricklayers Union. Without assurances that their local would retain its autonomy, Local 36–T rejected the proposal. Attempting to "change their minds," Barricelli met with Local 36–T members in February 1989. He told them that if they did not join the Bricklayers Union, he would speak to the local bricklayer unions in Massachusetts and Connecticut and tell them that the Local 36–T finishers were carpenters and should not be permitted to work in those jurisdictions. The members were unpersuaded. Barricelli subsequently wrote the local bricklayer unions and asked them to replace the finishers represented by the Carpenters Union with helpers belonging to the Bricklayers Union. He sent copies of the letters to the Companies.

On March 29, 1989, the Association members signed an addendum to its contract with the Bricklayers Union covering the tile finishers; the addendum became effective April 1, 1989. Representatives of the Companies were told that Barricelli was claiming jurisdiction over all finishers' work and that Bricklayer Union setters would not work with the Carpenters Union after March 31, 1989. Thus it appears that the Companies felt some compulsion to sign the addendum to ensure that the setters would not strike. The agreement that the addendum modified contained a union security clause, which required that employees of the Association's

---

* Of the Seventh Circuit, sitting by designation.

members become members of the Bricklayers Union within eight days of the agreement's execution.

After signing the addendum with the Bricklayers Union, the Association and the Companies notified Local 36–T that they were terminating their collective bargaining agreement with Local 36–T. Furthermore, the Companies notified their employees that they would have to contact the Bricklayers Union business agent and be referred by the Bricklayers Union to be permitted to work on Monday, April 3, 1989. None of the finishers showed for work that day and the Companies replaced them with finishers from the Bricklayers Union.

Local 36–T filed unfair labor practice charges against the Companies, alleging that the Companies forced the finishers to join the Bricklayers Union, contributed unlawful support to the Bricklayers Union, and terminated their employees because they refused to join the Bricklayers Union. In April 1991, an administrative law judge issued a decision and recommended order, concluding that the Companies had not violated the Act. The ALJ found that the Companies told the employees on March 31, 1989, that they had to secure a *referral* from the Bricklayers Union by April 3 if they wanted to continue working. The National Labor Relations Board ("Board") reversed the ALJ, holding that the Companies had committed unfair labor practices. In so holding, the Board erroneously stated that the ALJ had credited testimony that on March 31 the Companies required their employees to *join* the union by April 3. The Board ordered that the employees be reinstated and compensated.

The Board thereafter sought enforcement in this Court. We noted that the Act requires a seven-day grace period for employees to join an employer-recognized union in the construction industry. 29 U.S.C. § 158(f). Thus only if the Companies required the employees to *join* the union by April 3—two days into that grace period—did they violate the Act. Despite the existence of testimony that could have supported the Board's conclusion, it relied instead on an erroneous reading of the ALJ's opinion, as noted above. We therefore vacated the Board's order and remanded "for a determination of whether the employers explicitly or implicitly conditioned continued employment on immediate membership in the Union." *Acme Tile,* 984 F.2d at 556.

The Board remanded the case to the ALJ for clarification. The ALJ reaffirmed its original decision that the Companies did not violate the Act, and the Board subsequently reversed. The Board concluded that the Companies violated Section 8(a)(1) and (2) of the Act, 29 U.S.C. § 158(a)(1) & (2), by conditioning continued employment on immediate union membership in derogation of the seven-day grace period contained in Section 8(f), 29 U.S.C. § 158(f). It also concluded that the Companies violated Section 8(a)(3) and (1), 29 U.S.C. § 158(a)(3) & (1), of the Act by discharging employees who refused to join the union. The Board again ordered, among other things, reinstatement with backpay. This appeal followed.

## II.

We will enforce an order by the Board only if it correctly applied the law and if its factual findings are supported by substantial evidence on the record. *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 22–23 (1st Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). The Act grants employees the right to "form, join, or assist labor organizations" and to refrain from such activity, 29 U.S.C. § 157, and makes it an unfair labor practice for employers to "interfere with, restrain, or coerce employees in the exercise" of those rights. 29 U.S.C. § 158(a)(1). The Act specifically prohibits employers from discriminating "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). The Act makes an exception to this broad prohibition that permits an employer to enter certain union security contracts requiring union membership as a condition of employment. 29 U.S.C. § 158(a)(3) (proviso). But this exception is itself limited by the Act: a union security agreement in the construction industry may only require union membership "after the seventh day following the begin-

ning of such employment or the effective date of the agreement, whichever is later." 29 U.S.C. § 158(f). Thus an employer commits an unfair labor practice if it terminates an employee during the seven-day grace period for failure to join the union despite the existence of an otherwise valid union security agreement. In addition, an employer who coerces an employee into joining a union may also commit an unfair labor practice under 29 U.S.C. § 158(a)(2) if the coercion amounts to unlawful "support" for that union.

The Board concluded that the Companies violated Sections 158(a)(1), (2), and (3). Key to that conclusion, and contrary to the ALJ's decision, was its factual finding that the Companies "implicitly conditioned their employees' continued employment on immediate membership in the Bricklayers Union." 318 N.L.R.B. No. 47, 1995 WL 496836. The Board reasoned that the Companies' requirement that the employees obtain a "referral," "approval," or "clearance" from the union was tantamount to requiring immediate membership in the union, because the employers' statements would "reasonably and foreseeably lead their employees to believe that membership in the Bricklayers Union by April 3 was required in order to continue working." *Id.*

The Companies initially contend that the Board did not comply with this Court's remand instruction from the original appeal. On remand, we required the Board to make a determination as to whether the Companies had explicitly or implicitly conditioned continued employment on union membership. 984 F.2d at 556. In its original opinion, the Board had essentially stated that the Companies made union membership an explicit condition, but we found that determination to be based on an erroneous reading of the ALJ's findings. We noted that testimony existed that might demonstrate an explicit condition, but that the Board had not relied on that testimony. It is quite apparent from any fair reading of the Board's latest decision that it complied with this Court's remand instructions. Deciding not to base its holding on the testimony just mentioned, which was contradicted by other testimony, the Board found that the evidence supported a finding that the Companies had implicitly conditioned continued employment on union membership. The Board complied with our remand instructions to the letter, and the only remaining question is whether its determination was supported by substantial evidence.

█ On the issue of substantial evidence, the Companies first argue that the Board lacked any basis for rejecting the ALJ's finding that the Companies merely advised their employees of the procedures under the new contract rather than coerced them into joining the Bricklayers Union. The ALJ concluded that the employers' statements were simply observations of the natural consequences of the union security provision in the new contract and that the employees were merely informed of how the new procedures would affect them when they returned to work the following Monday. While it is true that we afford the ALJ deference on questions of witness credibility, *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496–497, 71 S.Ct. 456, 468–469, 95 L.Ed. 456 (1951), we do not agree with the Companies that the Board necessarily rejected a credibility determination of the ALJ to reach its conclusion, nor would it necessarily be dispositive if it had. *Id.* (implying that deference to the factfinder is subsumed in the substantial evidence test). The Board accepted testimony credited by the ALJ to the effect that the Companies had not expressly conditioned continued employment on union membership—that the Companies only required a "referral," "approval," or "clearance" from the union. In determining that even these statements amounted to an unlawful implicit condition, the Board relied on additional evidence regarding the circumstances in which these statements were made. The Board did not reverse any credibility findings made by the ALJ.

█ Furthermore, substantial evidence supports the Board's findings on the circumstances surrounding the statements and their implicit message to the employees. The Board first turned to the governing contract and noted that there was no contractual reason why the Companies needed to require a "referral" from the Union. The contract provided that employers could freely hire or

**562**

reject qualified journeymen at a job site. Thus requiring a "referral" from the Union implied that the employees would have to join the Bricklayers Union in order to remain on the job. The Board then recounted the Bricklayers Union's ongoing campaign to force all finishers into the Union. Both employers and employees were generally aware of Barricelli's efforts in this regard, including his threatening letters and oral statements. Based on Barricelli's actions, the employees would assume that in order to obtain a "referral," they would have to join the Bricklayers Union; the Companies could reasonably have drawn the same conclusion. Thus viewing the statements in the context of the ongoing campaign, the Board had substantial support for its conclusion that requiring a "referral" was tantamount to conditioning continued employment on union membership.

 The Companies acknowledge in their brief to this Court that the record evidence could support an inference that union membership was necessary for continued employment, but they state that the evidence equally supports the opposite inference— that union membership was not necessary so long as the employees obtained a referral. (Pet. Br. at 31). The Companies misconstrue the substantial evidence test. Our task is to ask whether the Board's conclusion rests on substantial evidence, not whether some other conclusion is equally supportable. *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464–465; *Teamsters Local Union No. 42 v. NLRB,* 825 F.2d 608, 612 (1st Cir.1987); *Andino v. NLRB,* 619 F.2d 147, 151 (1st Cir.1980). The Companies' additional argument that the Board's conclusions relate to two employers not involved in this appeal is also without merit. The Board mentioned testimony specific to those two companies, but the substantial evidence outlined above relates equally to the present Companies.

 Finally, substantial evidence supports the Board's finding that the Companies terminated their employees for failing to join the Bricklayers Union. The ALJ had concluded that employees failed to show up for work only because of their loyalty to the Carpenters Union. The Board properly con-

cluded that the ALJ's finding was merely speculative. The record indicated that some finishers later joined the Bricklayers Union and returned to work, undercutting the ALJ's conclusion that loyalty prevented employees from working. The record also contained statements by the Companies that work stoppages could occur in Massachusetts and Connecticut, where they had collective bargaining agreements with the Bricklayers Union, if employees in those states did not join the Bricklayers Union. The Board's conclusion that employees failed to show up for work based on a belief that they would not be allowed to do so without first joining the Bricklayers Union was therefore supported by substantial evidence.

### III.

For the foregoing reasons, the Board's order is ENFORCED.