USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2282

 BSP TRANS, INC.,

 Petitioner,

 v.

 UNITED STATES DEPARTMENT OF LABOR,

 Respondent,
 _____________________ 

 ROBERT MICHAUD,

 Intervenor.

_____________________ 

 ON PETITION FOR REVIEW OF A FINAL DECISION AND ORDER 
 OF THE UNITED STATES DEPARTMENT OF LABOR
 ADMINISTRATIVE REVIEW BOARD

 Before

 Lynch, Circuit Judge,
 
 Campbell and Bownes, Senior Circuit Judges.
 

 Lawrence C. Winger with whom Kraft & Winger was on brief for
petitioner, BSP Trans, Inc.
 Barbara A. W. McConnell, Attorney, United States Department of
Labor, Office of the Solicitor, with whom Marvin Krislov, Deputy
Solicitor for National Operations, Joseph M. Woodward, Associate
Solicitor for Occupational Safety and Health, and Barbara
Werthmann, Counsel for Appellate Litigation, were on brief for the
United States Department of Labor.
 Louis B. Butterfield with whom Olafsen & Butterfield was on
brief for intervenor, Robert Michaud.

 
 
 November 3, 1998
 
 
 
 
 

 CAMPBELL, Senior Circuit Judge. This is a petition to
review an order of the United States Department of Labor
Administrative Review Board (the "Board"). See 49 U.S.C. 
31105(c). The Board has ruled that BSP Trans, Inc. ("BSP")
violated the Surface Transportation Assistance Act of 1982 ("STAA")
by terminating one of its employees, Robert Michaud, in retaliation
for his having complained to his BSP supervisors about BSP's
failure to comply with federal transportation safety regulations. 
BSP contends that the Board erred by rejecting the factual findings
of the U.S. Department of Labor administrative law judge ("ALJ")
who initially heard the case. BSP also contends that the STAA does
not protect the purely internal complaints Michaud claims to have
made. We reverse the Board's order, holding that the Board was
obligated under applicable regulations to uphold the ALJ's
findings, because these findings were supported by substantial
evidence on the record as a a whole. 
 I. BACKGROUND
 BSP is a trucking company that transports general freight
as a contract carrier in intrastate and interstate commerce. The
company is based in New Hampshire and operates five terminals in
New Hampshire, Vermont, and Maine. Michaud was employed at BSP's
terminal in Westbrook, Maine between July and December, 1993. His
employment ended on December 23, 1993, when he was terminated,
ostensibly for photocopying confidential BSP documents and being
evasive when his supervisors confronted him about it. Michaud
claimed this reason was a pretext, and that the real reason for his
termination was his complaints to management that BSP was requiring
its truck drivers to exceed the hours permitted under U.S.
Department of Transportation ("DOT") regulations. Michaud insists
he photocopied company documents only to document these violations.
 In January, 1994, Michaud requested that the Occupational
Safety and Health Administration ("OSHA") investigate his
termination. OSHA made a preliminary determination that BSP
wrongfully terminated Michaud and ordered BSP to reinstate him. 
BSP objected to the order and requested a de novo hearing. A
hearing was held before an ALJ from the U.S. Department of Labor.
 Michaud's testimony before the ALJ was widely discrepant
from that of his supervisors. The ALJ resolved these discrepancies
and related credibility issues in favor of the supervisors and
against Michaud. The critical issue in the present petition is
whether, in light of a regulation making the ALJ's findings
conclusive if supported by substantial evidence on the record as a
whole, the Board was entitled to reject those findings. We begin
by summarizing the testimony of the key witnesses. We then recount
the different findings of both the ALJ and the Board. Finally, we
discuss the appropriateness of these findings and their legal
effect.
 A. Testimony Before the ALJ
Robert Michaud's Testimony
 Michaud testified that he began working as a commercial
truck driver at the Westbrook terminal in July, 1993. In
September, he read one of BSP's documents which referred to U.S.
Department of Transportation ("DOT") regulations limiting the
number of consecutive and weekly hours commercial truck drivers
could operate. He testified to being concerned that he and BSP
were violating them. He said he mentioned the regulations to
fellow driver Jeffrey Labrecque, who said BSP was exempt from the
regulations based on "the Railroad Act of New Hampshire." 
 According to Michaud, he then asked a state trooper about
the regulations. The trooper advised Michaud to contact the DOT to
see if the regulations applied to BSP, and if so, to copy documents
detailing Michaud's hours. Michaud testified that he next
contacted the DOT and spoke to a woman he identified only as
"Susan." Susan told him BSP drivers could be on-duty only 12 hours
per day and 60 hours per week. Michaud said that he did not tell
anyone at BSP about his conversations with Susan or the state
trooper.
 In mid-October, Michaud received his three-month
performance evaluation from BSP. According to Michaud, his overall
evaluation was "definitely above average," but his rating for
quantity of work was "satisfactory." When Michaud asked night
supervisor Glen Osterberg why his rating was merely "satisfactory,"
Osterberg is said to have replied that it was because, unlike other
BSP drivers, Michaud was unwilling to drive extra runs on
Saturdays. Michaud stated that while he would welcome the
additional income from extra Saturday runs, he was already working
the maximum weekly hours permitted by DOT regulations. Osterberg 
responded that the regulations did not apply to BSP. The next day,
Michaud contends he had a similar conversation with terminal
supervisor Alex Kasny, and Kasny also stated that BSP was exempt
from the regulations and that Michaud should "get it out of [his]
mind."
 Michaud testified that he then went to safety director Ed
Paul and described what he called "a vicious cycle": BSP day
trucks often returned late to the terminal, causing the night
trucks to leave late. Because the night truck drivers' on-duty
time included time spent at the terminal waiting to be dispatched,
the effect of the day trucks arriving late was that the night truck
drivers either had to exceed the speed limit or end up working more
hours than were permitted by DOT regulations. 
 Then, sometime in late October or early November, Michaud
says he spoke to BSP president Jack Law. Michaud explained the
"vicious cycle" to Law and stated that it was illegal to require
drivers to work more than 60 hours per week. Law listened and
smiled, but quickly changed the subject. Michaud then raised the
issue with day supervisor Dave Andrews, who told Michaud that he
would discuss the matter with acting terminal manager Michael
Greany.
 Around this time, Michaud began copying his and other
drivers' time cards and manifests to document what Michaud believed
were BSP's violations. On at least one other occasion, another BSP
driver gave Michaud his manifest for copying. Michaud stated that
it was not unusual to photocopy one's own time card in the presence
of BSP management, as drivers typically kept copies in case they
were paid for fewer hours than they had actually worked. He also
claimed that occasionally he would do favors to other drivers by
photocopying their time cards for them if he was already at the
copy machine. He did not consider the time cards to be
confidential. 
 Just before Thanksgiving, Kasny brought Michaud and
fellow truck driver Larry Roy into his office. He asked Michaud
and Roy to make local runs in the afternoon in addition to their
normally scheduled runs. Michaud testified that, with Roy present,
he told Kasny that those hours would be illegal and he would not do
it. Kasny responded, according to Michaud, that BSP was not
subject to the DOT regulations and Michaud should "get it out of
[his] thick skull about . . . illegal hours." Michaud complied,
but began looking for other jobs. 
 According to Michaud, approximately a week before
Christmas, he repeated his complaints to Greany, who replied,
"Well, it was nice knowing you. Have a good holiday." Michaud
interpreted this comment to mean that he was about to be fired. 
 On December 23, 1993, Michaud arrived at the terminal
early in the morning and began copying other drivers' time cards to
document their hours. Fellow employees Dane Evoga and Dan Vaughn
were already at the copy machine, but the machine had jammed. 
Michaud fixed the paper jam, made copies of the time cards, and
left the room. 
 Later that morning, Osterberg told Michaud to punch in
and go see Kasny. Kasny asked both Michaud and Osterberg to come
into his office. Kasny asked Michaud if he had been copying other
drivers' time cards and manifests. Michaud said yes, but mentioned
that he did it as a favor to other drivers, when he happened to be
ahead of them in line at the copy machine. Michaud testified, "In
other words, I was avoiding telling them the whole thing. I was
doing those without permission, the other ones." When Kasny asked
if Michaud copied other drivers' time cards without their
permission, Michaud remained silent because, as he stated, "now
they were pinning me down . . . [a]nd I figured if I revealed that,
I'm fired." Michaud testified that he didn't believe either Kasny
or Osterberg ever asked him why he was copying the documents, and
he did not tell them. Michaud was told that he was terminated.
Dan Vaughn's Testimony
 Vaughn was one of the dock workers who was using the copy
machine when Michaud entered the terminal's office on December
23rd. Vaughn testified to the following: Michaud and another
driver, Jeffrey Taylor, entered the office sometime between 3 a.m.
and 4 a.m. Michaud was talking about "making a file to cover his
ass." Taylor opened the wooden file cabinet where the manifests
were stored and removed a stack of documents. The two men also
retrieved time cards from the drivers' room outside the office. 
Michaud began to photocopy the documents and asked Taylor to stand
look-out at the door to the office. This conduct lasted
approximately 15-20 minutes. 
 During this time, Vaughn was sitting at a desk on the
other side of the office. Michaud and Taylor chatted with Vaughn
and generally made no effort to hide from him what they were doing. 
At one point, Vaughn walked over to the copy machine and recognized
the time card of employee Pete Chiasson. Among the stack of
documents he saw Michaud copying, that was the only document he
specifically identified. 
 Vaughn believed that what Michaud and Taylor had done was
"wrong," and he went to Andrews later that morning. Vaughn
testified that he told Andrews what he had witnessed, stating, "I
didn't think it was right, you know, employees in there filing
through stuff and copying the manifests . . . copying other
people's time card[s]."
Dave Andrews' Testimony
 Andrews testified that he understood Vaughn to say that
Michaud alone did the copying, with Taylor merely assisting him by
acting as look-out. Andrews stated that he then alerted Kasny. 
However, he told Kasny only about Michaud's involvement, because,
according to Andrews, the manifests were Andrews' primary concern
and Vaughn had reported that only Michaud was doing the copying. 
He knew that drivers often copied their own manifests, but believed
that he ought to advise Kasny that Vaughn had seen Michaud copying
"a stack of manifests."
 Andrews further testified that Michaud had previously
mentioned to Andrews that he wanted to make more money and once
asked him, "Is there any way to get these day drivers in here any
earlier?" However, according to Andrews, Michaud had never
mentioned to him excessive hours or the DOT hours of service
regulations. During Michaud's employment, Andrews was aware that
drivers were working long hours and not keeping logs, and he knew
that might violate DOT regulations. The issue, however, never came
up in conversation with Michaud, and Andrews never discussed it
with his superiors.
Alex Kasny's Testimony
 Kasny testified that, at approximately 7:30 a.m. on
December 23rd, Andrews approached him and stated that Vaughn had
witnessed Michaud making copies of time cards and other paperwork
in the office. When Andrews said that was all he knew, Kasny
summoned Vaughn to his office. 
 Vaughn repeated to Kasny that he had witnessed Michaud
copying time cards and other paperwork, and that file drawers in
the office had been opened and files were laying out. Kasny
assumed the "other paperwork" meant manifests, since they would
provide a quick, easy way of getting information about multiple
customers at once. Manifests, Kasny explained, include information
regarding BSP's customers, all the trucking companies with which
BSP has agreements, what freight is being transported, and, by
inference, BSP's rate structures. Manifests do not, however,
directly state BSP's rates; that information is printed on BSP's
bills of lading, which were also located in the file cabinet. 
 Kasny then called Greany. He told Greany that he was
concerned because Michaud had been caught copying manifests. 
Greany told him he would call back. About an hour later, Greany
called back and told Kasny to bring Michaud and a witness into
Kasny's office and ask Michaud directly whether he had been making
copies of time cards and manifests. 
 Michaud arrived for his shift at approximately 5:00 p.m. 
Kasny asked Osterberg and Michaud into his office and closed the
door. He asked Michaud, "Did you make any photocopies of time
cards and/or manifests?" Michaud responded, "Who told you this? 
Did the dock guys tell you this? They've been out to get me." 
Kasny repeated his question a total of six times. Each time,
Michaud stated only that he had copied his own time card, and Larry
Roy's, at Roy's request. Kasny then told Michaud that he had been
seen copying time cards and manifests, and that he would be
terminated. He asked for Michaud's fuel card and toll cards and
asked Michaud to leave the premises. 
 Kasny called Greany to "let him know of the conversation
that I had, and that Mr. Michaud was was, indeed, dismissed from
employment." Because he was relatively new to his management
position, Kasny did not believe he had the authority to terminate
employees, "unless it was just an out-and-outright blatant type
incident." He stated that while he recommended to Greany that
Michaud be terminated, the ultimate decision was Greany's.
 Kasny testified that, prior to Michaud's termination,
Michaud never complained to him about DOT hours of service
regulations. Michaud did not mention the regulations or his hours
during Michaud's mid-October performance evaluation. Rather, the
only topic discussed during the meeting was whether Michaud was
entitled to more than the 50-cent-per-hour raise he was told he
would receive. Michaud also said nothing about illegal hours or
DOT regulations when Kasny confronted him about the copying of
documents. While Kasny himself was familiar with the regulations
from his own days as a truck driver, he insisted that the first
time he heard allegations that BSP violated them was several months
after Michaud was terminated. 
Michael Greany's Testimony
 Greany testified that, on December 23rd, he was in
Londonderry, New Hampshire. He received a phone call from Kasny,
who told him that Michaud had been caught copying time cards and
manifests. Greany was not particularly concerned about copying of
time cards, because he knew that such practice was commonplace
among BSP drivers. He was quite concerned, however, about the
copying of manifests because he viewed those documents as
potentially valuable to competitors. He thought of a conversation
he had with Michaud in late October or early November in which
Michaud was upset that he had not received a raise that he thought
he had been promised. Greany immediately became concerned that
Michaud was copying the documents for profit. 
 Kasny asked Greany what he should do, and Greany told
Kasny he would discuss the matter with company president Jack Law
and get back to him. Greany conferred with Law and telephoned
Kasny. During this second conversation, Kasny also mentioned that
the drawer to the file cabinets was open when Michaud was copying. 
Greany told Kasny that while Michaud's conduct required "instant
dismissal," Kasny should try to find out exactly what documents had
been copied.
 Later that afternoon, Kasny called Greany to report what
had happened when he confronted Michaud. Kasny reported that
Michaud had been evasive and very uncooperative, but ultimately
admitted to photocopying time cards (both his own and others') and
manifests. At that time, Greany did not yet think that Michaud had
actually been terminated, so he told Kasny to "let him go."
 Greany testified that throughout Michaud's employment he
was unaware of the DOT hours of service regulations, even though it
was his responsibility to be aware of them. He stated that Michaud
never once mentioned to him hours of service or expressed "any kind
of regulatory concerns." Approximately a week before Christmas,
Michaud mentioned to him that the company lost money when the day
trucks arrived late and stated, "it's tough to make up for that
because of the type of schedules that they're operating on." 
Greany simply replied, "We can't control the shipping community. 
We get them back as soon as we can, and we go out." The day
Michaud was terminated, Kasny did not report that Michaud had
raised these issues, and Greany was not even aware of the DOT
regulations at that time.
Jeffrey Taylor's Testimony
 Jeffrey Taylor testified that he never assisted Michaud 
copy documents on December 23rd or any other day. He stated that
on December 23rd, he was not even present at the Westbrook terminal
because he was receiving workers' compensation at the time. During
the time that he was receiving workers' compensation - from
December 1, 1993, to February 26, 1994 - he came to work only
twice, December 13 (he believed) and February 22. 
 B. The ALJ's Decision 
 In September, 1996, the ALJ issued a recommended decision
ruling that Michaud's termination did not violate the STAA. The
ALJ's reasoning was straightforward - that Michaud did not register
"internal complaints cognizable as protected activity under the
Act." We quote liberally from the ALJ's decision, omitting only
citations to the record:
 First, there is no corroboration whatsoever for Mr.
 Michaud's testimony. This lack of corroboration is
 troubling, given that complainant contends that at least
 one driver, Larry Roy, was present during the . . .
 conversation with Kasny in late November 1993. Nor was
 "Susan" from DOT further identified or called to testify,
 Mr. Michaud's testimony stands alone and directly
 contradicted by three witnesses. Kasny, Andrews, and
 Greany denied that the hours of service subject came up,
 although they recalled a number of occasions when
 complainant discussed the "vicious cycle." Other
 discrepancies indicate that complainant's memory of the
 events is perhaps more as he wishes they had occurred,
 rather than how they actually occurred. For example,
 Dave Andrews recalls telling complainant that his desire
 to have the day shift trucks come in earlier was not
 workable because the customers dictate the volume of
 freight. Greany echoed this fact of business life. Yet
 Mr. Michaud testified that Andrews agreed with him about
 bringing the day trucks in earlier. Another discrepancy
 is that Kasny and Andrews deny talking to complainant
 about the New Hampshire Railway Act, but complainant may
 have talked to another driver, Jeffrey Labrecque, about
 it. 

 Second, Mr. Michaud's own testimony was extremely vague
 and often tangential. He spoke haltingly about key
 events, and was frequently unable to remember dates, and
 who said what. It is unnecessary to determine whether
 his lack of clarity stems from conscious dissembling, for
 Mr. Michaud himself admitted that his mental state causes
 his mind to wander and lose focus. As a result, he is
 not a reliable witness.

 Third, complainant's statements about the "vicious cycle"
 and getting his run accomplished centered primarily on
 his extra job assignments and concern with making more
 money, rather than on perceived safety or hours
 violations.

 Finally, the fact that Mr. Michaud kept his alleged early
 contacts with the DOT and state trooper a secret from BSP
 management suggests that he either did not make those
 contacts at all or that he was not really seriously
 concerned about management making a change. In this
 regard, I find complainant's testimony contradictory and
 not at all reconcilable. Complainant testified that
 before his October review, he instituted a conversation
 with a state trooper about the hours of service rules;
 again, he was very vague about the when, where and what
 of these contacts. However, he claims that he did not
 see the document that "jogged his memory" and "concern"
 about the hours of service rules until the October review
 itself. There is no explanation for why, if he had no
 concern about the hours of service violation until the
 review, he supposedly called the DOT and stop[ped] a
 state trooper before that time. Even assuming he
 telephoned DOT and contacted the trooper after the
 review, it is undisputed that he did not disclose the
 company's name to state or federal authorities, nor tell
 BSP about the contacts. A reasonable inference is that
 his level of alleged concern was somewhere between
 minimal and none. The evidence leaves it very uncertain
 whether Mr. Michaud actually contacted DOT or spoke to a
 state trooper.

 In short, I find that Mr. Michaud was engaged primarily
 in a struggle to get his point across to Alex Kasny, who
 was simply too new in his job to handle the situation
 well. while this may have been poor management, along
 with an interpersonal struggle, it was not about DOT
 hours of service violations. Rather, the record
 convinces me that the hours-of-service issue was
 incidental and, more likely than not, after the fact of
 discharge. For these reasons, I conclude that the
 complainant has not shown by a preponderance of the
 evidence that he registered internal complaints
 cognizable under the Act.

 The ALJ therefore recommended that Michaud's claim of
discrimination be dismissed, and Michaud objected to this
recommendation before the Board.
 C. The Board's Decision
 On January 6, 1997, the Board rejected the ALJ's
recommended decision and ruled that Michaud's firing violated the
STAA. Specifically, the Board concluded that Michaud's conduct was
protected by the STAA and BSP's stated "'legitimate' reason for
firing Michaud [was] not credible." 
 The Board initially acknowledged its duty under STAA Rule
109(c)(3) to accept as conclusive the ALJ's findings that were
supported by substantial evidence. However, the Board stated,
"some of the ALJ's factual findings are not supported by the record
evidence and consequently we make corrected findings of fact." 
 Most importantly, the Board credited Michaud's testimony
that he had complained to Osterberg, Kasny, Paul, Andrews, and Law
about excessive hours under the DOT regulations. The ALJ had
questioned whether these conversations had ever taken place and
stated that Michaud's "statements about the 'vicious cycle' and
getting his run accomplished centered primarily on his extra job
assignments and concern with making more money, rather than on
perceived safety or hours violations." The Board decided that this
statement by the ALJ was not supported by substantial evidence,
citing Greany's testimony that Michaud mentioned the late departure
of night drivers out of concern for the company's money, not
Michaud's own money. The Board reasoned that "if Michaud only
wanted to earn more money and did not have safety concerns, he
would have agreed to make extra runs on Saturday."
 The Board also rejected the ALJ's finding that "the
person who made the decision, and the only person with authority to
make the decision, to discharge Mr. Michaud was Michael
Greany . . . [and] there is no reliable evidence that Greany knew
about any 'hours of service' complaints by complainant." According
to the Board, the record showed that Kasny was "instrumental in the
firing," and alternatively, that Greany "had actual knowledge of
Michaud's complaint about the 'vicious cycle' and in light of that
knowledge he also knew that copies of time cards could substantiate
Michaud's suspicion of time in service violations." 
 Moreover, the Board disagreed with the ALJ about
Michaud's alleged conversations with the state trooper and "Susan"
from the DOT. The ALJ found that Michaud's failure to mention
these conversations to his BSP supervisors suggested that the
conversations had never occurred at all. The Board responded,
"[i]n light of BSP's failure to take corrective action when the
violation was brought to it's [sic] attention . . . [c]ommon sense
dictates that Michaud would want to have documentary evidence of a
violation before filing a complaint and would not want his employer
to know about the complaint until it was filed." 
 The Board ultimately found that 
 [BSP's] stated "legitimate" reason for terminating
 Michaud, [i.e., that he was caught copying time cards and
 manifests,] is not credible because the company did not
 treat the manifests as confidential and the information
 on manifests would reveal little to a competitor. We
 further find that Michaud established by a preponderance
 of the evidence that BSP discharged him for engaging in
 the protected activity of gathering evidence that BSP
 suspected would be used to support a complaint about
 hours of service violations. 

 The Board remanded the cause to the ALJ for a
recommendation on damages. Five months later, the ALJ recommended
that Michaud be awarded damages for back pay, front pay, health
insurance benefits, compensatory damages in the amount of $75,000,
as well as attorneys' fees, costs, and equitable relief. This
recommendation was adopted by the Board with only minor
alterations. BSP then brought this petition seeking review of the
Board's final order. 
 II. DISCUSSION
 We review the Board's final order according to the
standards of the Administrative Procedure Act, 5 U.S.C. 701 et.
seq. We must affirm the Board's decision unless its legal
conclusions are arbitrary, capricious, or otherwise not in
accordance with law, or if its factual findings are unsupported by
substantial evidence. See 5 U.S.C. 706(2); Clean Harbors Envtl.
Serv., Inc. v. Herman, 146 F.3d 12, 19 (1st Cir. 1998).
 Section 405(a)(1)(A) of the STAA provides in relevant
part:
 (a) Prohibitions. (1) A person may not
 discharge an employee regarding pay, terms, or
 privileges of employment because--

 (A) the employee, or another person at the
 employee's request, has filed a complaint or
 begun a proceeding related to a violation of a
 commercial motor vehicle safety regulation,
 standard, or order, or has testified or will
 testify in such a proceeding . . . 

49 U.S.C. 31105(a)(1)(A). 
 We have held that, in order to state a claim of
retaliatory discharge under this section, the complainant must
demonstrate that he or she engaged in a protected activity, that
he or she was subjected to adverse employment action, and that a
causal connection existed between the protected activity and the
adverse action. See Clean Harbors, 146 F.3d at 21. If a
complainant makes out a prima facie case, the employer may rebut
that showing with evidence of a legitimate, non-retaliatory reason
for the adverse employment action. See id. The burden then shifts
back to the complainant to prove that the proffered reason is
actually a pretext for unlawful retaliation. See id.; cf. Texas
Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)(setting
forth the burden-shifting framework). 
 BSP contends that the Board (1) erroneously failed to
defer to the ALJ's factual findings and (2) incorrectly interpreted
the STAA to include Michaud's conduct. We address these arguments
in turn.
A. The Board's Treatment of the ALJ's Factual Findings
 The Board rejected the ALJ's finding that the BSP
officials who terminated Michaud were unaware of his complaints
about the maximum hour regulations. The Board also rejected the
ALJ's finding that the real reason for Michaud's termination was
his copying manifests and being evasive when confronted about this
allegedly improper conduct. BSP now argues that the Board erred in
ignoring the ALJ's findings on these matters. We agree.
 The regulations promulgated pursuant to the STAA require
the Board to treat as conclusive an ALJ's factual findings "if
supported by substantial evidence on the record as a whole." 29
C.F.R. 1978.109(c)(3) ("STAA Rule 109(c)(3)"). Hence, while we
are authorized to review only the Board's decision, see 49 U.S.C.
 31105(c), in doing so 
 we must also determine whether under the STAA
 Rules [the Board] was bound by the ALJ's
 findings of fact. If there was substantial
 evidence to support the ALJ's findings, then
 the [Board's] refusal to treat them as
 conclusive was contrary to STAA Rule 109(c)(3)
 and [its] decision must be set aside.

Castle Coal & Oil Co. v. Reich, 55 F.3d 41, 44 (2d Cir. 1995). 
 We need, then, to review the record in its entirety, in
order to determine if the ALJ's findings were or were not supported
by substantial evidence. If they were, then the Board's rejection
of these findings constitutes legal error that may warrant
reversal. See Air America, Inc. v. Director, Office of Workers'
Compensation Programs, 597 F.2d 773 (1st Cir. 1979) ("It is within
our authority, in reviewing the Review Board's decision for legal
error, to reverse the Board if it erred in evaluating the evidence
underlying the ALJ's finding not to constitute substantial
evidence."); Prolerized New England Co. v. Benefits Review Board,
637 F.2d 30, 35-36 (1st Cir. 1980) (same). If, however, the ALJ's
findings were not supported by substantial evidence, we must then
also satisfy ourselves that the Board's own findings were based on
substantial evidence.
 "Substantial evidence is more than a scintilla, and must
do more than create a suspicion of the existence of the fact to be
established. It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." NLRB v.
Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939)
(internal quotation marks and citation omitted). Substantial
evidence does not require, however, such proof as would foreclose
the reasonable possibility of an alternate conclusion. It is,
therefore, possible for the Board's findings to conflict with the
ALJ's but for each set of findings to be supported by substantial
evidence. In such a case, the ALJ's findings would prevail, given
STAA Rule 109(c)(3). See Brink's, Inc. v. Herman, 148 F.3d 175,
179 (2d Cir. 1998) ("Thus, if we determine that the ALJ's decision
was based on substantial evidence, we must reverse the [Board] and
order that the ALJ's decision be adopted; this is so even if the
[Board's] decision was also based on substantial evidence."). 
 The crux of the ALJ's recommended decision was that there
was no connection between Michaud's alleged complaints about the
DOT regulations and his termination. We think that this finding
was supported by substantial evidence on the record as a whole,
with the result that the Board's decision must be set aside. 
Specifically, substantial evidence supported the ALJ's finding that
 while [the handling of Michaud's complaints] may have
 been poor management, along with an interpersonal
 struggle, [the complaints were] not about DOT hours of
 service violations. Rather, the record convinces me that
 the hours-of-service issue was incidental and, more
 likely than not, after the fact of discharge.
 According to Michaud, he complained about illegal hours
 to Osterberg, Kasny, Paul, Law, Andrews, Kasny (again), and finally
 to Greany. However, as the ALJ noted, not a single witness
 corroborated this part of Michaud's testimony. Osterberg, Paul,
 and Law were not called as witnesses. Nor was Larry Roy, whom
 Michaud testified was present when, just before Thanksgiving,
 Michaud says he told Kasny that his hours violated the DOT
 regulations and Kasny responded, "Get it out of your thick skull
 about . . . illegeal hours." 
 In fact, Kasny, Andrews, and Greany each testified that
excessive hours or the DOT regulations never came up in their
conversations with Michaud. Kasny stated that the only employment
issue Michaud ever discussed with him was whether Michaud was
entitled to a raise. Andrews also stated that Michaud mentioned
that he wanted to earn more money. According to Andrews, the only
discussion even remotely related to hours of service was Michaud's
stray comment one day, "Is there any way to get these day drivers
in here any earlier?" Andrews testified that, though Andrews was
aware of the DOT regulations, Michaud never directly mentioned them
to him, and he did not think Michaud's comment was about them. 
Greany's testimony was similar to that of Andrews. He testified
that Michaud never once mentioned to him any "regulatory concerns"
or excessive hours of service. In fact, Greany stated that, until
OSHA began its investigation after Michaud's termination, he was
entirely unaware that the regulations even existed.
 While a fact finder could have believed Michaud and
disbelieved the other witnesses, we are unable to say that a
reasonable mind could not also credit the testimony of Kasny,
Andrews, and Greany. The ALJ had the advantage of seeing and
hearing the witnesses. She specifically found Michaud not to be a
"reliable" witness. The others' testimony was adequate to support
the conclusion that Michaud never complained to them about
excessive hours or other violations of the DOT regulations. If
Michaud never made such complaints, his discharge could not have
been based on them. The Board, of course, disagreed, discrediting
these witnesses' testimony by stating "if Michaud only wanted to
earn more money and did not have safety concerns, he would have
agreed to make extra runs on Saturday." The unstated inference, of
course, is that if Michaud's "vicious cycle" comments were not
merely about money, then they must have been about excessive hours. 
 Even if this is one possible inference, it is scarcely so
apparent as to permit the Board to reject, on a cold record and its
own speculation, the ALJ's credibility determinations. It is the
ALJ's usual province to make determinations about witness
credibility. See, e.g., ACME Tile & Terrazzo Co. v. NLRB, 87 F.3d
558, 561 (1st Cir. 1996). While these determinations may be
overturned if unsupported, the Board is not entitled to reject them
without stronger evidence of mistake than this record demonstrates. 
To be sure, where the Board and the ALJ agree as to the existence
of a particular fact, the Board may draw different inferences from
that fact, see Kallman v. NLRB, 640 F.2d 1094, 1099 (9th Cir.
1981), but that is not what occurred here. Here, several witnesses
presented diametrically opposed testimony as to a particular fact,
and the ALJ has found one version credible and the other not
credible. The effect of STAA Rule 109(c)(3) is that the Board
cannot simply disagree, unless no reasonable mind could accept as
adequate the relevant evidence on which the ALJ's findings rested. 
 
 That threshold was not met here. Except for Michaud, no
witness testified to Michaud's having complained of illegal hours
or the DOT regulations to BSP management, or to anyone else for
that matter. And, given Michaud's admitted memory problems and
often erratic testimony, reasonable minds could have concluded that
Michaud was either not telling the truth or remembering events as
he wished they had been, rather than as they were. 
 B. The Board's Interpretation of the STAA
 BSP argues that Michaud cannot invoke the protection of
the STAA because, at the time of his termination, he had not "filed
a complaint or begun a proceeding" within the meaning of 49 U.S.C.
 31105(a)(1)(A). The ALJ determined that Michaud "ha[d] not shown
by a preponderance of the evidence that he registered internal
complaints cognizable under the Act." Because we hold that the
Board was obligated to accept the ALJ's finding that Michaud never
actually complained to his supervisors about DOT hours of service
violations, we need not consider whether this conduct would have
been protected. Obviously, an employer cannot retaliate on the
basis of complaints never made. 
 The Board, however, also stated, 
 [e]ven if we were to conclude that Michaud's internal
 complaints did not constitute protected activity, there
 is no doubt that Michaud engaged in protected activity
 when he copied time cards and his own manifest as
 evidence of hours of service violations. Gathering
 evidence to be used to support a protected complaint is
 itself protected under whistle blower provisions.
While we do not dispute that the STAA protects some acts of
evidence-gathering to be used to support a protected complaint, we
reiterate that the Board was bound to accept the ALJ's finding that
there was no complaint to support. And, if Michaud never
complained to his supervisors about DOT regulations, they would
have little reason to think that his photocopying time cards and
manifests was an attempt to document BSP's violations. Both Kasny
and Greany testified that they believed the reason Michaud was
copying documents was that manifests contained information that was
potentially valuable to BSP's competitors. 
 The manifests did, in fact, provide information about the
cargoes BSP carried, although the novelty of this information and
the extent to which BSP treated it as confidential were disputed. 
In any case, the actual utility of this information is not
conclusive here. As a panel of this court recently noted, the
scope of protection afforded under the STAA depends on whether the
employee's conduct was "sufficiently definite to put [the employer]
on notice that he was engaging in protected activity." Clean
Harbors, 146 F.3d at 22. The panel recognized that "[c]learly
there is a point at which an employee's concerns and comments are
too generalized and informal to constitute 'complaints' that are
'filed' with an employer within the meaning of the STAA." Id. We
have no occasion to identify that exact locus here. We simply hold
that in the absence of Michaud's actual complaint to management, he
cannot invoke the protections of the STAA based merely on his
copying of company papers for the undisclosed purpose of
documenting the company's perceived regulatory violations. We note
that Michaud himself testified that, at the conference at which
Kasny indicated he was dismissed, Michaud nonetheless never
disclosed his purpose for copying the company papers, and there is
no evidence that such disclosure was made at another time before
discharge. 
 Because the ALJ's supported factual findings lead to the
conclusion that Michaud did not engage in protected activity, we
need proceed no further. Clean Harbors, 146 F.3d at 21. 
 The decision of the Board is reversed and remanded with
instructions to enter judgment on behalf of the petitioner.