Laura LAMBERT; Esther Ackley; Steve Belling; Pat Cooke; Letitia Selk; Chuck Viltz, Plaintiffs–Appellees–Cross–Appellants,

v.

Barry ACKERLY, William Ackerly; Seattle SuperSonics Inc., a former Washington corporation; Full House Sports & Entertainment Inc., a Washington corporation; SSI Sports Inc., a Washington corporation, Defendants–Appellants–Cross–Appellees.

Nos. 96–36017, 96–36266 and 96–36267.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 1998.

Decided Oct. 1, 1998.

Andrew L. Frey, Mayer, Brown & Platt, Washington, DC, for defendants-appellants-cross-appellees.

Spencer Hall, Jr. and John W. Widell, Mundt, MacGregor, Happel, Falconer, Zulauf and Hall, Seattle, WA, for plaintiffs-appellees-cross-appellants.

Before: BRUNETTI, RYMER, and KLEINFELD, Circuit Judges.

BRUNETTI, Circuit Judge:

Defendants appeal a verdict in favor of plaintiffs on plaintiffs' claims that they were discharged by defendants in retaliation for complaining about overtime compensation, in violation of the federal Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3), and in violation of the public policy of the state of Washington. Plaintiffs, six former ticket sales account executives for the Seattle SuperSonics professional basketball team, were awarded compensatory and punitive damages as a result of the jury's finding that defendants, the Seattle SuperSonics, Inc., Full House Sports & Entertainment Inc., and Barry and William Ackerly, unlawfully discharged plaintiffs in retaliation for their overtime complaints.

The district court denied defendants' motion for judgment as a matter of law, but remitted plaintiffs' punitive damages award. The district court also awarded plaintiffs attorneys' fees. The defendants now appeal

both the denial of their motion for judgment as a matter of law and the attorneys' fee award. Plaintiffs cross-appeal with respect to the issue of attorneys' fees.

## FACTS

Plaintiffs Esther Ackley, Steve Belling, Pat Cooke, Laura Lambert, Letitia Selk, and Chuck Viltz were all employed by Full House Sports & Entertainment, Inc. (Full House) as ticket sales account executives (AEs) for the Seattle SuperSonics, a team in the National Basketball Association. The corporate defendants are the Seattle SuperSonics, Inc. (the Sonics) (formerly known as SSI Sports, Inc.) and Full House.[1] The individual defendants are Barry Ackerly and his son William Ackerly, corporate officers and directors of the corporate defendants.

As AEs, plaintiffs solicited orders for Sonics season tickets, multi-game packages, and group sales. They also staffed a season ticket information booth at Sonics basketball games. Beginning in 1991, AEs were paid a base salary of $13,000, with most of their compensation based on commissions. Also in 1991, the Sonics began paying AEs a $2,000 allowance for overtime worked at basketball games and other events. Any employee who exhausted this overtime was required to stop working or to take compensatory time. The Sonics paid this $2000 allowance in semi-monthly installments of $166.67 during the basketball season, regardless of overtime actually worked. By December of the 1993–94 season, with Sonics tickets largely sold out, the AEs' workweek was cut back to 20 hours plus game nights, and the automatic overtime payments were discontinued.

In March 1994, John Dresel, Sonics Executive Vice President, authorized Laura Kussick, Sonics Senior Vice President of Sales, to restructure ticket sales operations. Kussick concluded that the AEs, who were earning $60,000–$90,000 per year, were overpaid. Thereafter, Kussick and Ticket Sales Director Bob Boustead discussed a plan to alter the AEs' compensation structure with plaintiffs Lambert and Viltz, who had been chosen by the AEs to represent the group in discussions with Sonics management about compensation. A new compensation system was put into effect in June 1994, and in August 1994, Boustead instituted a fixed 8:30 a.m. to 5:30 p.m. workday for the AEs.

Meanwhile, after realizing that she had not been paid the full $2000 in overtime compensation for the 1993–94 season, Lambert left a note with Sonics Controller Brian Dixon on May 2, 1994, requesting a meeting. Lambert also raised the overtime issue with Boustead that day. On May 4, 1994, Lambert phoned the U.S. Department of Labor (DOL) to ask for information regarding overtime laws. Following that phone conversation, Lambert again spoke with Boustead, who said that overtime compensation was a "dead issue."

At a May 16, 1994 ticket sales department meeting, the AEs complained about the lack of overtime compensation, and were told by Boustead that they would receive no overtime the following year. Lambert then called the DOL again and asked for documentation regarding overtime requirements. Lambert presented this information to Dixon and to Sonics Payroll Manager Eddie Roldan on May 20, 1994. Dixon allegedly told Lambert that he knew the Sonics were breaking the law, but that William Ackerly did not care, and would not pay overtime. According to Lambert, Dixon threatened to fire her if she continued to pursue the overtime issue.

On June 17, 1994, Lambert's attorneys sent Barry Ackerly a letter requesting that the Sonics compensate Lambert and the other employees for overtime, in accordance with Washington law. Then, on July 6, 1994, Lambert delivered, but did not file, a complaint for unpaid overtime on her own behalf, naming Barry and William Ackerly and the Sonics as liable parties. On October 6, 1994 the Sonics settled Lambert's claim in exchange for a full release. At the same time, the Sonics paid other employees, including several of the present plaintiffs, amounts due them for overtime.

---

1. At the time of their discharge, the plaintiffs were employed by Full House. Prior to the time Full House was organized to run the SuperSonics, the AEs were employed by the entity known as the Seattle SuperSonics, Inc. The two corporate entities were treated collectively at trial.

Less than a week after settling the overtime claims, on October 12, 1994, Dresel wrote a memo to William Ackerly informing Ackerly that, in anticipation of a mid-season decline in AE work, Dresel was planning to layoff the entire ticketing staff by November 30, 1994. Near the end of October 1994, the Sonics required each AE except Lambert to sign a memorandum stating that he or she had been paid overtime compensation for October 1992 through October 1994, and that he or she was not owed any further compensation.

On October 17, 1994 Full House was organized to run the Sonics business organization, and Dresel was named as President. Full House executives decided to restructure the ticket sales staff and to implement a "fluctuating workweek," whereby anyone working more than eight hours in one day had to take corresponding compensatory time that week. Under this plan, only Dresel could authorize overtime.

During the 1994–95 season, the Sonics played in the Tacoma Dome while a new Key Arena was being built in Seattle. According to defendants, ticket demand was much smaller in Tacoma, and Kussick determined that the Tacoma Dome's group sales staff, which had ties to Tacoma companies, could better manage group sales. Thus, on December 2, 1994, Dresel held a meeting with the AEs at which he discharged nine of the ten employees on the Sonics ticket sales staff, including the six present plaintiffs. Three days prior to the announcement of the layoffs, Sonics management held a meeting with their public relations director and developed a strategy memorandum for explaining the impending layoffs.

Full House offered the discharged AEs severance packages, available only to those employees who signed a release of all claims and who agreed not to reapply for new AE positions after the restructuring of the ticket sales staff. The AEs all declined the package, but none applied for the restructured positions that Full House began to fill in March 1995. Rather, the AEs filed the present suit in state court. Thereafter, the case was removed to federal district court by the defendants.

A three-week jury trial was held before the district court on plaintiffs' claims that they were discharged by defendants in retaliation for complaining about the lack of overtime compensation, in violation of the FLSA, 29 U.S.C. § 215(a)(3), and in violation of the public policy of the state of Washington, as embodied in Wash. Rev.Code § 49.46.100(2). Prior to trial, defendants conceded that certain of their overtime practices were in violation of applicable laws, and the district court granted partial summary judgment as to this issue.

The trial resulted in a general jury verdict for plaintiffs in the amount of combined wage losses of $697,000, emotional distress damages totalling $450,000, and a total of $12 million in punitive damages ($5 million against the corporate defendants, $4 million against Barry Ackerly, and $3 million against William Ackerly).

After trial, defendants moved for judgment as a matter of law, or in the alternative, for a new trial and/or remittitur. On August 12, 1996, the district court entered an order denying the motion for judgment as a matter of law, but finding that the punitive damages verdict was excessive, and therefore remitting it to $1,394,000 per defendant, for a total of $4,182,000 in punitive damages. In addition, the district court awarded plaintiffs attorneys' fees in the amount of $389,117.50. On October 24, 1996, the district court awarded plaintiffs supplemental attorneys' fees in connection with the post-trial motion in the amount of $44,075.

## DISCUSSION

### I. Standard of Review

 This court reviews the district court's grant or denial of a renewed motion for judgment as a matter of law de novo. *E.E.O.C. v. Pape Lift Inc.*, 115 F.3d 676, 680 (9th Cir.1997); *Forrett v. Richardson*, 112 F.3d 416, 419 (9th Cir.1997). The reviewing court's role is the same as that of the district court. *Forrett*, 112 F.3d at 419. Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reason-

able conclusion, and that conclusion is contrary to the jury's. *Id.* (citation omitted).

## II. Liability

The plaintiffs alleged that they were retaliated against in violation of both the federal FLSA and the public policy of the state of Washington. We now hold that the plaintiffs failed to state a valid claim under federal law, but were properly allowed to proceed with their claims under Washington law.

### A. Retaliation for Informal Complaints Is Not Covered Under the FLSA

■ The FLSA's anti-retaliation provision makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Defendants urge us to strictly construe this provision, so as to exclude the present plaintiffs' informal complaints from its coverage.

■ "As in all cases of statutory interpretation, our starting point in determining Congress's intent must be the language of the statute itself." *Fernandez v. Brock,* 840 F.2d 622, 632 (9th Cir.1988); *Dunn v. CFTC,* 519 U.S. 465, 117 S.Ct. 913, 916, 137 L.Ed.2d 93 (1997) ("'[A]bsent any 'indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it' "); *see also West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 100–01, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *Union Bank v. Wolas,* 502 U.S. 151, 158, 162, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991).

At trial, the district court instructed the jury that "[a]n employee has participated in protected activity if the employee has either complained to superiors regarding any issues related to the Fair Labor Standards Act or requested information from the government about minimum wages or overtime compensation." We hold that this instruction was incorrect under federal law.

■ The question of whether § 215(a)(3) covers informal complaints has never before been addressed by this court. *See Knickerbocker v. City of Stockton,* 81 F.3d 907, 912 n. 3 (9th Cir.1996) (declining to decide whether internal complaints are protected conduct under the FLSA). However, this issue was recently considered by the Second Circuit, which held that "[t]he plain language of [section 215(a)(3) ] limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor." *See Lambert v. Genesee Hospital,* 10 F.3d 46, 50, 55 (2d Cir.1993), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). Because we agree with the *Genesee* court that the language of the FLSA's anti-retaliation provision is plain and unambiguous, we now adopt the Second Circuit's analysis.

■ In *Genesee,* certain female employees alleged that they were retaliated against in violation of the Equal Pay Act (EPA).[2] Specifically, the female employees claimed that the promotion of a male employee to manager was in retaliation for the female employees' complaints to their supervisors about the denial of equal pay and for other complaints of discrimination. *Id.* at 51. Because the *Genesee* plaintiffs' retaliation claims all arose out of informal, oral complaints to a supervisor, the Second Circuit held that the plaintiffs failed to state a cause of action under § 215(a)(3). *Genesee,* 10 F.3d at 54–56.

In reaching this conclusion, the court contrasted Title VII's broad anti-retaliation provision with the FLSA's narrower coverage. Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has *opposed any practice* made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an

---

2. The EPA is an amendment to the FLSA and is codified under the same chapter. Therefore, retaliation for filing EPA complaints, like retaliation for filing overtime complaints, is analyzed under § 215(a)(3). *See Genesee,* 10 F.3d at 55.

investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (emphasis added). The "opposition" language in Title VII's anti-retaliation provision clearly encompasses an employee's complaint to supervisors, regardless of whether the employee also files a formal charge with the Equal Employment Opportunity Commission. *Genesee,* 10 F.3d at 55 (citation omitted). No such broad language is found in the FLSA's anti-retaliation provision.

The Second Circuit also distinguished its earlier case of *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872 (2d Cir.1988). In *Casey,* a DOL investigator, acting on a worker's overtime complaint, found that the employer had not properly paid overtime and had falsified its records in an attempt to hide its wrongdoing. *Id.* at 874–75. After the employer eventually admitted the violations and agreed to pay overtime wages, the employer nonetheless asked the employees to return the back overtime wages. Those who refused were fired. Noting the connection between the earlier formal proceedings and the retaliatory conduct, the court stated that the protection against retaliation under the FLSA "would be worthless if an employee could be fired for declining to give up the benefits he is due under the Act." *Id.* at 879. Thus, it was clear in *Casey* that there had been a formal complaint made to the DOL by an employee, a formal investigation, and a finding of overtime violations.

Similarly, in *Brennan v. Maxey's Yamaha, Inc.,* 513 F.2d 179 (8th Cir.1975), a company was ordered to pay back wages after a DOL investigation disclosed minimum wage and maximum hour violations. The company later insisted that employees endorse back the back wage checks. An employee protested this as unlawful conduct on the company's part and was fired. The court held that the employee's protest was an act protected from reprisals, finding that "[h]er discharge was a direct result of her insistence upon receiving retroactive benefits required under the Act." *Id.* at 181.

In contrast, in *Genesee,* the acts for which the employer allegedly retaliated did not in any way grow out of the formal filing of a complaint. *Genesee,* 10 F.3d at 55–56.

Rather, there were "simply oral complaints to a supervisor that an employee was being paid less than the complainants thought she should have been." *Id.* at 56.

The present case is much more closely analogous to *Genesee* than to *Casey.* Here, neither Lambert nor any of the other plaintiffs actually "filed" a formal complaint or instituted or testified in an FLSA proceeding. Rather, Lambert merely complained about overtime to her supervisor and to other Full House employees; called the DOL for information, and informed her superiors that she had done so; had her lawyers send a letter to Barry Ackerly regarding the overtime issue; and had a complaint delivered to the Sonics. Because such conduct is not encompassed by the plain and unambiguous language of § 215(a)(3), the plaintiffs have failed to state a retaliation claim under the FLSA.

We recognize that several other circuits have come to the conclusion that informal complaints and requests for information from the DOL do constitute protected activities under § 215(a)(3). *See E.E.O.C. v. Romeo Community Schools,* 976 F.2d 985, 989 (6th Cir.1992) (holding that complaining to a school district of unlawful sex discrimination and expressing the belief that the law is being broken are sufficient to state a retaliation claim); *E.E.O.C. v. White & Son Enterprises,* 881 F.2d 1006, 1011 (11th Cir.1989) (holding that unofficial complaints to an employer about unequal pay constitute an assertion of rights protected under the statute); *Brock v. Richardson,* 812 F.2d 121, 124–25 (3d Cir.1987) (holding that retaliation based on employer's mere belief that an employee filed a formal complaint is sufficient to bring employer's conduct under the FLSA); *Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 387 (10th Cir.1984) (holding that it is the assertion of statutory rights, not the filing of a formal complaint, which triggers a retaliation claim); *Crowley v. Pace Suburban Business Div.,* 938 F.2d 797, 798 (7th Cir.1991) (broadly construing the statute to protect against retaliation for an employee's assertion of rights under the FLSA); *Brennan,* 513 F.2d at 181. These circuits have reached this conclusion by extending the language of

§ 215(a)(3) beyond its plain meaning so as to "effectuate the broad remedial purposes of the FLSA." We, however, reject this approach in light of the clear language of the statute.

### B. Washington Law Covers Informal Overtime Complaints

■ Regardless of their failure to state a valid retaliation claim under federal law, the plaintiffs have asserted in their complaint state law claims for violation of public policy. Washington law prohibits retaliation against an employee who "has made *any* complaint to [her] employer" or who "has caused to be instituted or is *about to* cause to be instituted any proceeding under or related to the [Washington wage and overtime laws]." Wash. Rev.Code § 49.46.100(2) (emphasis added).[3] Since there is no dispute that Lambert complained to her superiors about the lack of overtime pay, and threatened on several occasions to file suit, Lambert has stated a valid retaliation claim under Washington law.

### C. All of the Plaintiffs Have Stated a Valid Cause of Action Under Washington Law

■ Defendants argue that because all of the plaintiffs other than Lambert predicate their retaliation claims on Lambert's overtime complaints, they are covered by neither § 215(a)(3) nor Washington law, both of which impose liability for the discharge of "such employee" as engaged in protected conduct.

According to defendants, if the court is to give the words "such employee" any meaning, those words must be held to confine liability to the discharge of the employee who herself was engaged in the protected conduct. We hold, however, that sufficient evidence was presented in this case to support a retaliation claim on behalf of all of the plaintiffs. The AEs have clearly shown that they complained as a group about overtime violations, and that Lambert pursued her claim for the benefit of the entire group. For instance, in their original letter to the Sonics, Lambert's attorneys referenced both Lambert's overtime complaints and those of the other employees. Thus, the defendants were on notice, specifically and directly, that Lambert and the other employees were making demands for overtime compensation. Moreover, Lambert, as well as Sonics officials, testified at trial that Lambert and Viltz were acting as spokespersons for the whole group of AEs in negotiations over their compensation.

Because the evidence supports a finding that Lambert and Viltz were acting as representatives for the AEs in complaining about overtime compensation, all of the present plaintiffs were entitled to protection against retaliation under Washington law.

This case was tried under federal law with the assumption that Washington law also governed the plaintiffs' claims. Because the district court only considered the plaintiffs' claims under the FLSA when considering defendants' motion for judgment as a matter of law, we now remand to the trial court to reconsider the defendants' motion for judgment as a matter of law by reassessing the jury's finding of liability, taking into account only Washington law. Specifically, the district court must decide under Washington law whether the plaintiffs met their burden of proof as to causation and retaliatory intent, and whether or not the Ackerlys can be considered "employers" subject to personal liability.

### III. Damages

In light of the failure of plaintiffs' retaliation claims under § 215(a)(3), the parties'

---

**3.** Wash. Rev.Code § 49.46.100(2) provides in full that

Any employer who discharges or in any manner discriminates against any employee because such employee has made any complaint to his employer, to the director, or his authorized representative that he has not been paid wages in accordance with the provisions of this chapter, or that the employer has violated any provision of this chapter, or because such employee has caused to be instituted or is about to cause to be instituted any proceeding under or related to this chapter, or because such employee has testified or is about to testify in any such proceeding shall be deemed in violation of this chapter and shall, upon conviction therefor, be guilty of a gross misdemeanor.

arguments as to the availability of punitive damages under the FLSA are moot.

■ There is no dispute that Washington law does not allow for punitive damages in wrongful termination cases, *see Dailey v. North Coast Life Ins. Co.*, 129 Wash.2d 572, 919 P.2d 589 (1996); therefore, the punitive damages award is reversed.

■ Turning to the emotional distress damages, each plaintiff was awarded $75,000 by the jury for emotional distress. Defendants argue that this must have been the product of speculation because the different plaintiffs manifested different symptoms, some physical and some purely mental, and none of the plaintiffs provided any corroborating evidence. *See Brady v. Gebbie*, 859 F.2d 1543, 1558 (9th Cir.1988), *cert. denied*, 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989) (plaintiff presented psychiatric testimony of emotional distress and permanent psychological damage). Plaintiffs respond that the defendants mistreated all of the AEs in the same way, thereby justifying identical awards. The district court agreed with the plaintiffs, finding that "the jury must have concluded that the emotional harm to each plaintiff was roughly equal given their similar treatment by defendants."

■ A reviewing court must uphold the jury's finding of the amount of damages unless the amount is " 'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.' " *Los Angeles Memorial Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir.1986) (citations omitted).

We agree with defendants that $75,000 for emotional distress is grossly excessive given that the symptoms manifested by the plaintiffs were not particularly severe. *See Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1230 (7th Cir.1995) (finding unreasonable a $21,000 award for emotional distress in an FLSA retaliation case); *see also Hetzel v. County of Prince William*, 89 F.3d 169, 171 (4th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 584, 136 L.Ed.2d 514 (reversing a $500,000 award for emotional distress arising out of retaliation in violation of the First Amendment). Moreover, that plaintiffs were all awarded the same amount, despite the fact that their distress levels varied widely, suggests that the awards were the product of guesswork.

We therefore reverse with respect to the emotional distress damages and remand for determination of a reasonable amount should the district court find the defendants liable on remand.

### IV. Attorneys' Fees

Because the district court will be required on remand to redetermine the appropriate attorneys' fee awards in light of its decision as to liability, we express no opinion at this time on the attorneys' fee issues raised by the parties.

### CONCLUSION

■ In sum, we hold that the FLSA only prohibits retaliation for that conduct specifically enumerated in 29 U.S.C. § 215(a)(3). Washington law, on the other hand, protects against retaliation for any overtime complaint, including an informal complaint to a supervisor. Accordingly, we remand to the district court to reconsider defendants' motion for judgment as a matter of law.

AFFIRMED in part, REVERSED in part, and REMANDED.