United States Court of Appeals
For the First Circuit

No. 98-1399

ELAINE VALERIO,

Plaintiff, Appellant,

v.

PUTNAM ASSOCIATES INCORPORATED,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Selya, Circuit Judge,

Aldrich and Campbell, Senior Circuit Judges.

Robert J. Gilbert with whom Jeffrey B. Renton and Gilbert &
Renton, P.C. were on brief for appellant.
William B. Koffel with whom Foley, Hoag & Eliot was on brief
for appellee.

April 9, 1999

CAMPBELL, Senior Circuit Judge. Elaine Valerio appeals
from the district court's grant of summary judgment in favor of
Appellee Putnam Associates, Inc. ("Putnam"). Valerio sued Putnam
under the Fair Labor Standards Act, 29 U.S.C. 201 et seq. ("the
FLSA"), and Massachusetts law, claiming that she was entitled to
excess pay for overtime hours worked during her employment with
Putnam, and that she was terminated in retaliation for requesting
such pay. She now contends that the district court applied an
incorrect measure in calculating her overtime pay and erred in
ruling that her complaint to her supervisors was not protected
activity. We affirm the district court's rulings regarding her
claim for overtime pay and her claim for retaliation under
Massachusetts law, but reverse the lower court's ruling as to her
claim for retaliation under the FLSA. 

I. BACKGROUND
In October, 1994, Valerio was hired by Putnam, a health-
care consulting firm, for a "Receptionist/Administrative Assistant"
position. Her duties included answering telephones, receiving
packages, performing research from libraries and on-line databases,
maintaining client files, and other miscellaneous tasks. Putnam
told her at the time she was hired that the position was considered
"exempt" under the FLSA and she therefore would not be entitled to
overtime pay (the district court later determined that this
classification was incorrect).
In June, 1995, as part of Putnam's normal employee review
process, Valerio submitted a form entitled "Performance Review/Self
Evaluation." She wrote that she hoped she would be "relieved of
all receptionist duties and [would instead] concentrate on research
and admin[istration]." Valerio's immediate supervisor, Office
Manager Lisa Patterson, responded to Valerio's comments by telling
her that the company did not anticipate relieving her from
receptionist duties anytime soon. She also gave Valerio an oral
evaluation of her performance, reminding her that she needed to be
at the office at 8:30 a.m. to answer incoming phone calls.
Two months later, in August, 1995, Valerio began
attending law school classes during the evenings. During the first
week of that month, Patterson again met with Valerio to discuss her
job performance and expressed concern with Valerio's punctuality. 
In order to determine whether her admonitions were effective,
Patterson began keeping a written record of Valerio's daily arrival
and departure times. She did not tell Valerio she was doing this.
On September 7, 1995, Patterson wrote a lengthy letter to
Valerio which stated in part:
Punctuality. No matter what you believe as far as this
job was described to you (i.e. you claim it was never
expressly mentioned that this was a receptionist
position) you were and are aware that answering the phone
is part of the job. This means being here when the
office officially opens at 8:30 a.m. and staying till it
closes.

Patterson also stated that Valerio's recent enrollment in law
school night classes suggested that she was not "serious about a
career with Putnam."
On September 12, 1995, Valerio responded by letter. She
wrote in part:
I will repeat to you once again that I am not
a receptionist. I am classified as an exempt,
salaried employee and according to the Fair
Labor Standards Act published by the
Department of Labor, a receptionist, by the
nature of the job, not the title, cannot be an
exempt employee. If you insist on classifying
me as a receptionist, then I demand under FLSA
that I be reclassified as non-exempt and be
paid for all overtime hours worked. My
salary, offer letter and business cards all
indicate that my position is Research
Associate. Answering the phones is only one
part of my job . . . Additionally, I feel I
must disclose to you that I am considering
complaint options and have contacted the
Department of Labor. I would also remind you
that, "It is a violation of the Fair Labor and
Standards Act (FLSA) to fire and in any manner
discriminate against an employee for filing a
complaint or participating in a legal
proceeding under FLSA" and that "willfull
violations of FLSA may be prosecuted
criminally and the violator fined up to ten
thousand dollars." . . . If you retract your
letter and abide by the terms of my employment
agreement, I will walk away from these issues
with our professional relationship intact. I
will be diligent in my job performance (as my
last raise attests) and hold ho hard feelings. 
I would appreciate it if any further
communications on this matter be in writing.

On September 19, 1995, Kevin Gorman, Putnam's CEO,
terminated Valerio, stating that the introduction of a new network
modem system had eliminated the need for a Research Associate. 
Gorman gave her a letter confirming her termination and a final
paycheck that included $1,660.59, which the letter stated was "the
equivalent of overtime pay which might be applicable under the
Department of Labor FLSA Regulation 20 C.F.R. 778.114." Gorman
later testified under deposition that Valerio's deteriorating
relationship with Patterson was the "straw that broke the camel's
back." 
Valerio then instituted the present action. The district
court granted summary judgment in favor of Putnam, holding that,
while Valerio was a non-exempt employee and thus entitled to
overtime pay under the FLSA, Putnam's $1,660.59 severance payment
was more than what was required by the applicable "half-time"
overtime provisions. The lower court also dismissed her claims for
retaliatory termination, ruling that her sending the September 12,
1995, letter to her supervisors did not constitute protected
activity under the FLSA or Massachusetts law. Valerio appeals,
challenging each of these rulings. 

II. DISCUSSION

A. The Overtime Pay Claim
The parties do not contest the district court's
conclusion that Valerio was entitled to overtime pay under the
FLSA. They dispute only the amount. 
The FLSA's basic overtime provision states,
[e]xcept as otherwise provided in this
section, no employer shall employ any of his
employees who in any workweek is engaged in
commerce or in the production of goods in
commerce, or is employed in an enterprise
engaged in commerce or in the production of
goods for commerce, for a workweek longer than
forty hours unless such employee receives
compensation for his employment in excess of
the hours above specified at a rate not less
than one and one-half times the regular rate
at which he is employed.

29 U.S.C. 207(a)(1). The phrase "the regular rate at which [an
employee] is employed" is not self-defining. See Martin v. Tango's
Restaurant, Inc., 969 F.2d 1319, 1324 (1st Cir. 1992). Rather, the
Supreme Court "has glossed the governing language . . . in the case
of 'an employee working irregular hours for a fixed weekly wage'
where the hours regularly exceeded 40 hours a week." Id. (quoting
Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 573-74
(1942)). This gloss is reflected in the overtime compensation
regulations, which provide two methods by which to calculate an
employee's "regular rate" of pay. The first applies if the
employee is paid a fixed weekly salary for a specific number of
hours to be worked each week. 29 C.F.R. 778.113(a) ("Section
113"). The second applies if the employee is paid a fixed weekly
salary regardless of how many hours the employee may work in a
given week. Id. at 114(a) ("Section 114").
By its own terms, Section 114 applies only if there is "a
clear mutual understanding of the parties" that the fixed salary is
compensation for however many hours the employee may work in a
particular week, rather than for a fixed number of hours per week. 
In granting summary judgment for Putnam, the district court found
that there was no genuine dispute that, at the time Valerio was
hired, she knew that her weekly hours would fluctuate. Valerio
argues that her deposition testimony suggests otherwise. We have
read the testimony with care and disagree.
We agree with the district court that, even viewed in a
light most favorable to Valerio, the deposition testimony
demonstrates that Valerio understood that her fixed weekly salary
was to be compensation for potentially fluctuating weekly hours. 
She admits she was told that the hours were indefinite "8:30 to
whenever" and that she understood that there "possibly" could be
work days that would last longer than eight hours. She also
understood, and accepted at the time, that Putnam did not intend to
provide overtime pay if she worked more than 40 hours in a
particular week.
Additionally, the evidence of the parties' post-hiring
conduct reinforces Putnam's contention that Valerio understood that
her salary was to compensate her for fluctuating hours. During the
first eleven months of her employment, Valerio routinely worked
without complaint more than 40 hours per week without extra pay. 
See Mayhew v. Wells, 125 F.3d 216, 218 (4th Cir. 1997) ("[T]he
existence of [a 'clear mutual understanding'] may be based on the
implied terms of one's employment agreement if it is clear from the
employee's action that he or she understood the payment plan in
spite of after-the-fact verbal contentions otherwise."); Zoltek v.
Safelite Glass Corp., 884 F. Supp. 283, 286-87 (N.D. Ill. 1995)
(court inferred an "implied-in-fact agreement" that employee was to
receive the same salary regardless of how many hours worked where
he had worked fluctuating hours for 30 months for a consistent
salary and never protested). 
Valerio contends that this inference is tantamount to
"blaming the victim." The question, however, is simply the narrow
one of applying Section 114 in accordance with its terms, which
means determining whether there existed a "clear mutual
understanding" that Valerio's fixed salary would be compensation
for however many hours she worked each week. If so, Section 114
applies for purposes of calculating "the regular rate at which [the
employee] . . . is employed." The evidence demonstrates without
material contradiction such a "clear mutual understanding." 
Valerio argues that section 114 requires that the "clear
mutual understanding" must extend to how her overtime premiums
should be calculated. Because the parties initially agreed that
she would not receive any additional payments for overtime hours,
no agreement regarding calculation of overtime existed. But the
regulation calls for no such enlarged understanding. See Bailey v.
County of Georgetown, 94 F.3d 152, 156-57 (4th Cir. 1996) (rejecting
as "contrary to the plain language of the FLSA and [Section 114]"
the notion that employers and employees who have adopted a
fluctuating pay plan must understand the manner in which overtime
pay will calculated). The parties must only have reached a "clear
mutual understanding" that while the employee's hours may vary, his
or her base salary will not. 
In short, the district court correctly applied Section
114. And, because Valerio received even more overtime payment
($1,660.59) in her final paycheck than she was entitled to under
Section 114, Putnam's obligation under the FLSA was extinguished
and summary judgment was appropriate. See 29 U.S.C. 216(b) ("Any
employer who violates the provisions [of this Act] shall be liable
to the employee . . . affected in the amount of [her] . . . unpaidovertime compensation[.]") (emphasis supplied). 
Much the same reasoning disposes of Valerio's claim under
the Massachusetts overtime statute. Valerio argues that because
the Massachusetts statute has no analogue to Section 114, it
requires "time-and-a-half" overtime premiums be paid across-the-
board, even to employees who agreed to receive fixed salaries for
fluctuating workweeks. We do not agree. The basic overtime
provision of the Massachusetts statute is essentially identical to
the FLSA. Compare 29 U.S.C. 207(a)(1) with M.G.L. c. 151, 1A. 
Massachusetts adopted its nearly-identical statute almost twenty
years after the Supreme Court decided Overnight Motor and nearly a
decade before Overnight Motor's gloss was formally codified in
Section 114. The absence of a direct Massachusetts analogue to
Section 114 is, therefore, immaterial. To our knowledge, no
Massachusetts court has even suggested the distinction Valerio
seeks to advance, and, tellingly, she cites to no such case. We
conclude that both the FLSA and Massachusetts law compel the same
outcomes. Cf. Fakouri v. Pizza Hut of America, Inc., 824 F.2d 470
(6th Cir. 1987). 
B. The Retaliation Claim
The district court granted summary judgment for Putnam on
Valerio's claim for retaliatory termination, ruling that her
internal complaint on September 12, 1995 was not protected activity
under either the FLSA or Massachusetts law. We consider the
federal law and state law issues in turn.
(1) Retaliation Under the FLSA
The FLSA's anti-retaliation provision states:
[I]t shall be unlawful for any person to
discharge or in any other manner discriminate
against any employee because such employee has
filed any complaint or instituted or caused to
be instituted any proceeding under or related
to this chapter, or has testified or is about
to testify in any such proceeding, or has
served or is about to serve on an industry
committee[.]

29 U.S.C. 215(a)(3). The question raised here is of first
impression in this Circuit: whether FLSA's prohibition on
terminating an employee who "has filed any complaint or instituted
or caused to be instituted any proceeding" under or related to the
FLSA protects an employee who has lodged a written internal
complaint with his or her employer but has not filed a judicial or
administrative complaint. Federal courts of appeals grappling with
this issue have differed. To date, the Sixth, Eighth, Tenth, and
Eleventh Circuits have held that an internal complaint to the
employer may satisfy 215(a)(3), see EEOC v. Romeo Community
Schools, 976 F.2d 985, 989-90 (6th Cir. 1992); EEOC v. White & Son
Enterprises, 881 F.2d 1006, 1011 (11th Cir. 1989); Love v. Re/Max
of America, Inc., 738 F.2d 383, 387 (10th Cir. 1984); Brennan v.
Maxey's Yamaha, Inc., 513 F.2d 179, 181 (8th Cir. 1975), while the
Second and Ninth Circuits have held that a formal complaint to the
government agency or a court is required. See Lambert v. Ackerly,
156 F.3d 1018 (9th Cir. 1998); Lambert v. Genesee Hospital, 10 F.3d
46 (2d Cir. 1993).
This is indeed a close question, but we side with the
Sixth, Eighth, Tenth, and Eleventh Circuits. In deciding that the
FLSA's protections against retaliation are triggered only by a
formal filing with a court or agency, the Second and Ninth Circuits
concluded that 215(a)(3) is unambiguous. See Ackerly, 156 F.3d
at 1024; Genesee Hospital, 10 F.3d at 55. We do not agree. We
read the phrase "has filed any complaint" as susceptible to
differing interpretations. The word "complaint" itself is
certainly ambiguous. Webster defines "complaint" as either "the
act or action of expressing protest, censure, or resentment:
expression of injustice ([for example] about poor housing)" or as
a "formal allegation or charge against a party made or presented to
the appropriate court or officer (as for a wrong done or a crime
committed) and variously applied . . . " Webster's Third New Int'l
Dictionary 464 (1971). By failing to specify that the filing of
any complaint need be with a court or an agency, and by using the
word "any," Congress left open the possibility that it intended
"complaint" to relate to less formal expressions of protest,
censure, resentment, or injustice conveyed to an employer. Cf.Clean Harbors Environ. Serv., Inc. v. Herman, 146 F.3d 12, 19 & n.7
(1st Cir. 1998) (concluding that the phrase "filed a complaint or
begun a proceeding" in the anti-retaliation provision of the
Surface Transportation Assistance Act, 49 U.S.C. 31105(a)(1)(A),
is ambiguous because "the language does not say where a complaint
must be filed"). 
The strongest case for non-ambiguity rests perhaps with
the verb "filed." Had Congress spoken of "making" or "voicing" any
complaint there would be no question it intended to include
protests as well as purely "legal" complaints. Webster defines
"file" both as "to deliver (as a legal paper or instrument) after
complying with any condition precedent (as the payment of a fee) to
the proper officer for keeping on file or among the records of his
office" and "to place (as a paper or an instrument) on file among
the legal or official records of an office esp[ecially] by formally
receiving, endorsing, and entering." Webster's Third New
International Dictionary, at 849. But while file doubtless
formalizes matters, the second definition of "file" is sufficiently
elastic to encompass an internal complaint made to a private
employer with the expectation the employer will place it on file
among the employer's official records. Compare Lundervold v.
Core-Mark Int'l, Inc., 1997 WL 907915 (D. Or. Jan. 17, 1997)
(concluding that interpreting the word "filed" in 215 (a)(3) to
require a written complaint "[i]nstead of simplifying matters, . .
. simply trade[s] one set of problems for another.") 
Furthermore, if "filed any complaint" were read to
encompass only filings with a court or government agency, one would
wonder why the additional language "or instituted or caused to be
instituted any proceeding under or related to this chapter" was
inserted. The latter words become surplusage if the former means
only the filing of in-court or in-agency complaints. See Clean
Harbors, 146 F.3d at 20. When engaged in statutory interpretation,
courts may "assume that Congress used two terms because it intended
each term to have a particular, nonsuperfluous meaning." Bailey v.
United States, 516 U.S. 137, 146 (1995). 
Moreover, the word "any" embraces all types of
complaints, including those that might be filed with an employer. 
We conclude, therefore, that the statute does not have a plain
language meaning restricted to "legal" complaints but rather is
ambiguous as to the meaning of the word "complaint." Given that
ambiguity, we look further to discern Congress's intent. 
The legislative history of the FLSA unfortunately
provides no real guidance as to the intended scope of 215(a)(3). 
We find some assistance, however, in the broad purpose of the FLSA,
as interpreted by the Supreme Court. The FLSA has been treated as
remedial in purpose. See Tennessee Coal, Iron & R. Co. v. Muscoda
Local No. 123, 321 U.S. 590, 597 (1944). "For . . . practical and
other reasons," Congress sought to secure compliance with the
substantive provisions of the Act by having "employees seeking to
vindicate rights claimed to have been denied" lodge complaints or
supply information to officials regarding allegedly substandard
employment practices and conditions. Mitchell v. Robert DeMario
Jewelry, Inc., 361 U.S. 288, 292 (1960). Congress recognized that
"fear of economic retaliation might often operate to induce
aggrieved employees quietly to accept substandard conditions." Id. 
The Supreme Court has stated that the FLSA "must not be
interpreted in a narrow, grudging manner." Tennessee Coal, 321
U.S. at 597. The Court also spoke of the "remedial and
humanitarian" purposes of the Act, id., which, as we explain infra,
would hardly be furthered by a narrow reading of 215(a)(3). 
Under a construction limiting the protections of the anti-
retaliation provision to the filing of judicial or agency
complaints, an employer would be free to discharge an employee in
retaliation for asserting rights under the Act, so long as the
employer acted prior to the formal filing of such a complaint or
the institution of a proceeding under the Act. By protecting only
those employees who kept secret their belief that they were being
illegally treated until they filed a legal proceeding, the Act
would discourage prior discussion of the matter between employee
and employer, and would have the bizarre effect both of
discouraging early settlement attempts and creating an incentive
for the employer to fire an employee as soon as possible after
learning the employee believed he was being treated illegally. 
A narrow construction of the anti-retaliation provision
could create an atmosphere of intimidation and defeat the Act's
purpose in 215(a)(3) of preventing employees' attempts to secure
their rights under the Act from taking on the character of "a
calculated risk." Mitchell, 361 U.S. at 293. Such circumstances
would fail to "foster a climate in which compliance with the
substantive provisions of the Act would be enhanced." Id. at 292. 
Hence we, like many of our sister circuits, conclude that the
animating spirit of the Act is best served by a construction of 
215(a)(3) under which the filing of a relevant complaint with the
employer no less than with a court or agency may give rise to a
retaliation claim. 
Our own precedent in a closely related area supports this
interpretation. In Clean Harbors, a panel of this Court
interpreted very similar language in the anti-retaliation provision
of the Surface Transportation Assistance Act of 1982 ("STAA") to
include internal employee complaints. The STAA's anti-retaliation
provision states:
A person may not discharge an employee
regarding pay, terms, or privileges of
employment because the employee, or another
person at the employee's request, has filed a
complaint or begun a proceeding related to a
violation of a commercial motor vehicle safety
regulation, standard, or order, or has
testified or will testify in such a
proceeding[.]

49 U.S.C. 31105(a)(1)(A). The Clean Harbors panel concluded that
this language protected an employee who had filed purely
"intracorporate" complaints about alleged violations of federal
transportation safety law. See Clean Harbors, 146 F.3d at 14. 
The panel cited four bases for its decision. First, the
statutory language was ambiguous, in that it did not specify where
a complaint must be filed. Id. at 19 & n.7. Second, "Congress
hewed to this language when it reenacted the STAA in 1994, in the
face of long-standing administrative interpretation of the STAA and
similar language in other statutes to encompass internal complaints
made to an employer." Id. at 19. One of the cited "other
statutes" with "similar language" was the FLSA; the panel referred
to the courts of appeals decisions interpreting 215(a)(3) to
encompass internal complaints. See id. at 20. The panel also
cited other decisions that interpreted analogous whistleblower
protection provisions in the Clean Water Act, 33 U.S.C. 1367(a),
and the Federal Railway Safety Act, 45 U.S.C. 441. Third, the
panel explained that it owed deference to the Department of
Transportation's interpretation under Chevron because "in the
absence of unambiguous statutory language, this strikes us as the
sort of interstitial law making which Congress left to the agency." 
Clean Harbors, 146 F.3d at 19. Fourth, the panel described the
agency's policy choice to protect internal complaints to employers
as "eminently reasonable." Id. 
Putnam contends that Clean Harbors should not guide our
decision as some of the factors animating the Clean Harborsdecision are not present here. The factor of legislative
acquiescence is not present here and, as explained previously, we
discern no statement of agency position sufficient for deference
under the principles of Chevron. See supra, n.5. Putnam asserts
further that Clean Harbors is of limited value to the present issue
because the FLSA and the STAA have "very different purposes and
enforcement schemes" that demand different interpretations of their
respective anti-retaliation provisions. Putnam's argument, in
essence, is that because the STAA concerns public health and
safety, it is essential that employees be encouraged to inform
their supervisors of regulatory violations immediately so that they
can be promptly remedied; in the FLSA context, however, the need
for dispatch is diminished. Because violations of the FLSA do not
pose direct and immediate threats to public safety, Putnam asserts,
Congress must have intended to require FLSA complainants to avail
themselves of judicial or administrative remedies.
While the above contentions have some force, they are not
wholly persuasive. The need for dispatch in correcting safety
violations is only one of the many objects of the STAA's anti-
retaliation regime. As the Clean Harbors panel explained, forcing
employees with safety concerns to go straight to the government
would deny the company an opportunity to "remedy its own problems
voluntarily and quietly." Id. at 21. Internal complaints may be
seen as benefitting not only the employee, but the employer as
well. Id. See also id. at 19 (recognizing the value of "leveraging
the government's limited enforcement resources"). Finally, and
perhaps most importantly, the Clean Harbors court noted the value
of protecting employees "who in good faith assert safety concerns
to their employers, or who indicate an unwillingness to engage in
such violations" by "casting a broad net in the [field of] anti-
retaliation provisions." Id. at 21. The Clean Harbors panel
recognized, as we do supra, that "fear of economic retaliation
might operate to induce aggrieved employees to accept substandard
conditions." Mitchell, 361 U.S. at 292. In sum, many of the
animating policies cited by the Clean Harbors panel apply with
equal force to violations of the FLSA. 
We hold, therefore, that the FLSA's anti-retaliation
provision will protect an employee who has filed a sufficient
complaint with an employer. 
Of course, not all abstract grumblings will suffice to
constitute the filing of a complaint with one's employer. As the
Clean Harbors panel acknowledged, affording protection to employees
who lodge purely intracorporate complaints "unhelpfully leaves
employers in the dark" as to what types of assertions will rise to
the level of protected activity by their employees. Clean Harbors,
146 F.3d at 21. We agree that "[t]here is a point at which an
employee's concerns and comments are too generalized and informal
to constitute 'complaints' that are 'filed' with an employer within
the meaning of the [statute.]" Id. at 22. Even putting oral
complaints aside, as we do in this case, see note 4, supra, written
comments and criticisms made to an employer may not always amount
to filed complaints "under or related to this chapter." 29 U.S.C.
215(a)(3). We conclude, as did the panel in Clean Harbors, that
we have little choice but to proceed on a case-by-case basis,
addressing as a matter of factual analysis whether the internal
communications to the employer were sufficient to amount to the
"filing of any complaint" within the statutory definition.
Here, we conclude that Valerio's September 12, 1995
letter was sufficiently definite to notify Putnam that she was
asserting her statutory rights to overtime pay. She wrote to Lisa
Patterson, who was her direct supervisor and Putnam's Office
Manager, that, at least as long as she was required to be a
receptionist, she was misclassified as exempt under the FLSA, and
was entitled to overtime pay. While Valerio seems also to have
indicated a preference to remain as a Research Associate and
perhaps therefore an exempt employee (foregoing the receptionist
label), she stated she was "considering complaint options and have
contacted the Department of Labor." She quoted the relevant
statutory language regarding her claim and threatened legal action
if retaliation took place. 
Putnam insists that the letter should be read not as a
complaint itself, but merely a negotiating tool, with the
possibility of a complaint to the Department of Labor to follow if
Valerio's demands were not met. Putnam emphasizes that the letter
concludes with a statement in the conditional form: "If you retract
your letter and abide by the terms of my employment agreement, I
will walk away from these issues with our professional relationship
intact." 
We disagree with Putnam's argument for several reasons. 
First, it presupposes that a "complaint" under the FLSA must be
filed with the administrative agency, a notion which, as explained
previously, we reject. Second, it overlooks the very explicit
references to the FLSA and Valerio's stated intention to pursue
remedies under the Act if Putnam failed to meet her concerns. SeeClean Harbors, 146 F.3d at 21. Other courts have classified as
"complaints" statements far less definite than those here. SeeRomeo Community Schools, 976 F.2d at 989 (plaintiff who told school
district that she believed they were "breaking some sort of law" by
paying her lower wages than previously paid to male employees had
"filed any complaint" under the FLSA); White & Son Enterprises, 881
F.2d at 1007-08 (female employees who met with company owner and
foreman and asked for equal pay had "filed any complaint"). Third,
while the letter ends with an olive branch, its tone and overall
content could not have left Putnam with any doubt that Valerio was
complaining that she was mis-classified and was asserting her right
to overtime pay, unless, at least, Putnam was prepared to
reclassify her in accordance with her wishes. Putnam never did so
-- and it now concedes Valerio was all along entitled to overtime
pay. We do not think it lies in Putnam's mouth to claim the
benefit of a condition it at all times rejected. We, therefore,
reject Putnam's contention that Valerio's letter was not a
protected complaint but merely some form of unprotected negotiating
tool. 
(2) Retaliation Under Massachusetts Law
We must also consider how our explication of the FLSA
requirements affects Valerio's retaliation claim under
Massachusetts law, as she had alleged that "[a]nalogous protections
exist under state law." See Complaint, 23. The district court
dismissed this claim, ruling that Massachusetts does not appear to
recognize a common law cause of action where the relevant public
policy has already been vindicated by a state or federal statute. 
We agree, relying principally upon the decision of the
Massachusetts' Supreme Judicial Court ("SJC") in Melley v. Gillette
Corp., 491 N.E.2d 252 (Mass. 1986). 
In Melley, the SJC was asked to decide whether a
plaintiff who had failed to follow the procedures set forth in
Massachusetts' employment discrimination statute, M.G.L. c. 151B,
could nevertheless bring an age discrimination claim based on a
common law theory of wrongful termination. The SJC adopted the
analysis and conclusion of the intermediate appellate court, which
had reasoned: "[t]he rationale for implying a private remedy under
the 'public policy exception' to the traditional rule governing at-
will employment contracts is that, unless a remedy is recognized,
there is no other way to vindicate such a public policy." Melleyv. Gillette Corp., 475 N.E.2d 1277, 1228 (Mass. App. 1985)
(citations omitted). The intermediate court concluded that "where,
as here, there is a comprehensive remedial statute, the creation of
a new common law action based on the public policy expressed in
that statute would interfere with that remedial scheme." Id. at
1229.
To be sure, Melley did not address the precise issue
presented here, as it involved the effect of a comprehensive state
statute in the field, as opposed to a federal one. However, were
the SJC faced with the present situation, we do not believe that
the federal nature of the statutory remedy would make a
difference. Cf. Grubba v. Bay State Abrasives, 803 F.2d 746, 747
& n.1 (1st Cir. 1986)(assuming, without deciding, that Massachusetts
would not recognize a claim for breach of the implied covenant of
good faith and fair dealing if the public policy was already
vindicated by the federal Rehabilitation Act of 1973); compare,
e.g., Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1399 (10th
Cir. 1997) (Kansas would not allow a common law cause of action for
retaliatory discharge when the FLSA or state statute provides an
adequate remedy), with Amos v. Oakdale Knitting Co., 416 S.E.2d
166, 171 (N.C. 1992) (the existence of the FLSA or the state Wage
and Hour Act does not render moot North Carolina's public policy
exception unless there is federal preemption or the state statute
supplants the common law via exclusive remedies).
III. CONCLUSION
For the reasons stated, we affirm the district court's
grant of summary judgment in favor of Putnam as to Valerio's claim
for overtime pay under the FLSA and Massachusetts' overtime
statute. We vacate, however, the district court's grant of summary
judgment in Putnam's favor on Valerio's claim for retaliation under
the FLSA, and remand for further proceedings consistent with this
opinion. Last, we affirm the district court's grant of summary
judgment in Putnam's favor on Valerio's claim for retaliation under
Massachusetts law. 
So ordered. 
Each party to bear its own costs.